STATE OF NORTH CAROLINA v. WILLIAM THOMAS BARNES

No. 287A92

(Filed 2 July 1993)

1. **Homicide § 250 (NCI4th) — first-degree murder — premeditation and deliberation — defendant as perpetrator — sufficiency of evidence**

The State presented sufficient evidence that defendant was the perpetrator of a homicide and that he acted with premeditation and deliberation to support his conviction of first-degree murder where the State's evidence tended to show that the victim was shot at night at his body shop and three .22 caliber long rifle bullets were recovered from the victim's body and clothing; defendant and the victim had previously experienced ill will resulting from an ongoing love triangle involving them and a female; defendant had repeatedly threatened the victim's life; a week before the murder defendant demanded that the female meet him at a location down the street from the victim's body shop or he would go to the body shop and kill the victim; when the female arrived to meet defendant, he told her to take him to the shop because he wanted to "kill that old son-of-a-bitch"; defendant told the female more than once that she would be "going to a funeral"; defendant was opposed to an abortion obtained by the female and told her that the victim "would have the blood of his [defendant's] child on his hands"; the victim's dying words to the female were "[t]hat son-of-a-bitch shot me"; the motive for the killing was not robbery as the victim had over $1,300 in cash in his wallet; defendant had previously purchased a Browning .22 caliber rifle which would break down into two

STATE v. BARNES

[334 N.C. 67 (1993)]

separate pieces, thereby making it concealable in a small backpack; the rifle's box was found in defendant's home, but the rifle was absent from defendant's home following the shooting; the bullets found in defendant's body and clothing could have been fired from the Browning rifle purchased by defendant; defendant was identified as being in the vicinity of the victim's body shop in Eden, at a place "you rarely see anyone walking,". the day before the shooting; the day after the shooting, defendant was seen by hunters on wooded farm land behind the body shop, dressed in the same clothes that he had been seen wearing the day prior to the shooting; defendant lived in Greensboro, not Eden; a blue backpack identified as belonging to defendant was seen in the woods behind the body shop by the same hunters who had seen defendant; following the shooting, defendant drove to Virginia and then to South Carolina, leaving his blue backpack in a room used for storage in a cabin in Virginia; while incarcerated, defendant wrote a letter to his sister in which he self-servingly stated that he did not commit the crime but also stated that he "planned everything" so that she would be in the least possible danger; and defendant also told his sister in the letter that, if he was convicted, she was to gun down the drivers of the transport van as he was being moved to Central Prison so that he could escape. The State was not bound by defendant's exculpatory statement in the letter to his sister because this statement was contradicted and shown to be false by the other facts and circumstances in evidence.

Am Jur 2d, Homicide §§ 437 et seq.

2. **Evidence and Witnesses § 1070 (NCI4th)— instruction on flight—out-of-state visits—escape plan**

The trial court's instruction on flight was supported by evidence that, on the day following a homicide, defendant was seen by hunters in some woods behind the body shop where the homicide occurred; the next day defendant arrived at a friend's cabin in Virginia, where he stayed for two days; then he visited a friend in South Carolina for an additional two days; and both out-of-state visitations were unexpected by defendant's friends. The instruction on flight was likewise supported by evidence that, while awaiting trial, defendant wrote a letter to his sister planning his escape if convicted.

Am Jur 2d, Evidence §§ 633 et seq.

## STATE v. BARNES

[334 N.C. 67 (1993)]

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence entered by Morgan, J., at the 10 February 1992 Criminal Session of Superior Court, Rockingham County. Heard in the Supreme Court 13 April 1993.

Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.

Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.

MEYER, Justice.

On 13 November 1990, defendant, William Thomas Barnes, was indicted for the first-degree murder of Jessie William Lemons. Defendant was tried noncapitally in the Superior Court, Rockingham County, in February 1992 and was found guilty. The trial court thereafter imposed the mandatory life sentence.

The evidence presented by the State at trial tended to show the following. On the night of 31 October 1990 at 9:08 p.m., Lieutenant Jerry Pulliam of the Eden Police Department received a call to go to the Central Body Shop on Stadium Drive in Eden, North Carolina. When he arrived at 9:12 p.m., he observed off-duty Officer Ronald Brown kneeling on the ground beside the victim, Jessie William Lemons, who had been shot. Lieutenant Pulliam then saw Ms. Marla Rodgers,[1] who had placed the call for help, standing in front of the doorway of the body shop, screaming and yelling hysterically.

When Lieutenant Pulliam arrived, the victim could not speak. There was blood on his clothing, and Lieutenant Pulliam concluded from his examination that the victim had multiple gunshot wounds that appeared to have been made by a small-caliber weapon. In the victim's pants pocket, Lieutenant Pulliam found a wallet containing $1,325.59. Lieutenant Pulliam opined that the victim was no longer alive at the time the ambulance arrived.

Ms. Marla Rodgers knew the victim, with whom she had had an ongoing relationship for over ten years. Ms. Rodgers also knew defendant, William Thomas Barnes. She had a relationship with him beginning in the spring of 1990, and she cohabited with him

---

1. At the time of trial, Ms. Rodgers was referred to by her married name, Ms. Marla Rodgers Roof.

for a short period of time later that summer when she and the victim "had some problems." During the time that Ms. Rodgers was living with defendant in early August of 1990, the victim came to visit her at defendant's mother's convenience store, where she and defendant were working. The victim asked Ms. Rodgers if she would come outside and talk to him, and she did so. While the two of them were outside talking, defendant came outside and asked Ms. Rodgers if everything was okay, and she told him everything was fine.

A few days later, Ms. Rodgers stopped living with defendant in Greensboro and moved back in with the victim in Eden. Ms. Rodgers stayed in Eden with the victim only about a week because defendant began calling and arguing with the victim. There were many calls and arguments between defendant and the victim. After defendant would call and argue with the victim, the victim would argue with Ms. Rodgers. Ms. Rodgers then left the victim and moved back in with defendant in Greensboro.

Around 1 September 1990, Ms. Rodgers took a trip to Florida with the victim. She had learned that she was pregnant with his child, and they took the trip to "sort things out." When they returned from Florida, Ms. Rodgers stayed with the victim at his home in Eden. However, they had an argument about her pregnancy the day after they got back, so Ms. Rodgers left the victim's house again and moved back to Greensboro to stay with defendant.

Ms. Rodgers told defendant that she had decided to abort her pregnancy. Defendant was "very much against" the abortion, believing the child to be his own. Defendant told Ms. Rodgers that if she had the abortion, "[the victim] would have the blood of his [defendant's] child on his hands." In mid-September, Ms. Rodgers aborted the pregnancy at a clinic in Greensboro. She stayed with the victim at his home in Eden after the abortion. After four or five days, Ms. Rodgers went back to defendant's home in Greensboro and stayed there for about a week. Defendant became angry whenever the victim's name was mentioned and said that when the victim had come to the store on that prior occasion, "he should have went ahead and shot him then." Ms. Rodgers then returned to the victim's house.

On 22 October 1990, while Ms. Rodgers was staying at the victim's house, defendant called her several times. Defendant told Ms. Rodgers that he was at the Draper Club Market and that

STATE v. BARNES

[334 N.C. 67 (1993)]

if she would not meet him, he was going to the shop to kill the victim. Ms. Rodgers met defendant at a shopping center. Defendant got in Ms. Rodgers' car with a "pistol-type gun" "wrapped in a cloth with his bag." Defendant said, "Take me to the damn shop. . . . I want to kill that old son-of-a-bitch." Defendant told her that he knew where the victim lived and that he knew which bedroom the victim and Ms. Rodgers slept in. Ms. Rodgers convinced defendant to drive around and talk for awhile, and then they drove to defendant's home in Greensboro. Ms. Rodgers stayed there with defendant for about a week.

Ms. Rodgers decided to leave defendant on 29 October 1990. When she told him she was leaving, he hit her and choked her in an attempt to prevent her from going. Defendant told Ms. Rodgers that he was going to kill the victim, and he said more than once that she would be "going to a funeral." Defendant jerked some wires out of Ms. Rodgers' car to prevent her from leaving, so Ms. Rodgers ran to a service station and called the victim, who came and picked her up.

On the evening of 31 October 1990, Ms. Rodgers and the victim went to K-Mart to buy some candy and other items for his son's birthday. They left the K-Mart as it was closing at 9:00 p.m. and went to the Central Body Shop, which was owned by the victim. When they were ready to leave, the victim went outside to start the car. Ms. Rodgers remained inside the shop. She heard three "popping sounds" from outside, ran out, and saw the victim lying on the ground on his back. The victim said, "That son-of-a-bitch shot me." Ms. Rodgers called 911 and the victim's daughter.

Ms. Rodgers knew that defendant kept guns in his house. She testified that "he had a small gun that he carried in his pouch, and there were some guns upstairs, like shotgun, rifle-type guns, and then there were other guns, like paint guns." Defendant used the paint guns to play a game called "paintball," about which he had authored a book. The paintball game involves players divided into two teams, each with a base and a flag; the object of the game is to capture the other team's flag and to eliminate opposing players by shooting them with paintballs. Ms. Rodgers once played this game with defendant in some woods in Mebane, North Carolina.

William F. Nicely testified that he worked at Ed's Gun Shop in Southern Pines, North Carolina. Mr. Nicely identified a federal form used when buying a weapon. The form reflected the sale

of a Browning .22-caliber semiautomatic rifle, serial number 01244PN146, by Ed's Gun Shop to a Charles Howard Lockmuller Jr. on 19 February 1989. Charles Howard Lockmuller testified that he purchased the rifle from Mr. Nicely and that he sold the rifle to defendant in July or August of 1990. The serial number of the rifle, which was listed on the federal form, matched the serial number on a Browning rifle box found in defendant's home.

Dr. Anthony Macri, pathologist at Morehead Hospital in Eden, testified as an expert in forensic pathology. He performed an autopsy on the victim on 1 November 1990. The victim was sixty-five years of age. There were three gunshot wounds. Two bullets had passed through the body. A third bullet had entered and was still lodged in the body. The cause of death was a gunshot wound to the chest and massive injury to the heart. Dr. Macri recovered a bullet lodged in the wall of the abdomen, and another bullet was recovered from the victim's clothing by a nurse in the emergency room. A detective with the Eden Police Department recovered the third bullet when it fell out of the coat worn by the victim on the night of the shooting.

Thomas Trochum, Special Agent with the State Bureau of Investigation and forensic firearms examiner, identified the gold-coated Remington brand, .22-caliber, long rifle-fired bullets that had been retrieved from the victim and submitted to the laboratory on 2 November 1990. In his examination of the bullets, Agent Trochum found that "all were of six lands and grooves; their twist was to the right." Agent Trochum testified that he measured the bullets and that they were all consistent. The land impression was approximately forty thousandths of an inch wide; the groove impression was approximately seventy thousandths of an inch wide. "What that meant is that they could have all been fired from the same firearm." Agent Trochum opined that the bullets could have been fired from the Browning rifle purchased by defendant from Mr. Lockmuller.

A witness testified that on the morning of 30 October 1990, as she was driving down Stadium Drive in Eden below the Central Body Shop, she saw a person walking at a place "you rarely see anyone walking." The individual was wearing blue jeans and a plaid "outdoor-type" shirt. Later, when the witness saw a picture of defendant in the *Eden Daily News*, she recognized the picture "immediately as the man [she] had seen."

STATE v. BARNES

[334 N.C. 67 (1993)]

Two witnesses, Timmy Sanders and Billy Richardson, testified that on the afternoon of 1 November 1990, they were hunting on Fieldcrest Farm, which is located behind the Central Body Shop. Mr. Sanders found a blue backpack about ten yards from his deer stand. Mr. Sanders thought that the backpack belonged to another hunter and did not open it. Mr. Sanders testified that the blue backpack identified in court by Ms. Rodgers as belonging to defendant looked like the one he had seen in the woods. Mr. Richardson testified that he saw a man coming through the woods wearing "blue jeans and a checked shirt, or either a flannel jacket." The man had a knife on his side, a water bottle, and a black hat on his head. Upon seeing Mr. Richardson, the man jumped behind a tree, and then, after about five minutes, the man walked away. Mr. Richardson saw the photograph of defendant in the *Eden Daily News* and thought the photograph "kind of resembled" the person in the woods. Mr. Sanders also showed Mr. Richardson the blue backpack, and Mr. Richardson told Mr. Sanders to leave the pack where they had found it.

Michael Cullifer testified that on 2 November 1990, when he arrived home at his cabin in Craig County, Virginia, after work, he found defendant asleep on the couch. Defendant was dressed in jeans and a shirt and had a blanket as a cover. Mr. Cullifer asked defendant who he was, and defendant said that he was a friend of Mr. Cullifer's cousin. When Mr. Cullifer's cousin, Michael Woods, came to the cabin, he and defendant left together. Mr. Woods testified that on 2 November, defendant was dressed in blue jeans and a flannel shirt, and his belongings consisted of "a backpack and a blanket and pillow." Mr. Woods allowed defendant to shower and shave at his house. Defendant stayed with Mr. Woods for two days. When defendant was leaving, Mr. Woods noticed defendant was driving a blue rental car. After defendant had left, Mr. Woods discovered that defendant had left his backpack in a bedroom used for storage. Mr. Woods identified the same blue backpack previously identified by others as defendant's. Mr. Woods subsequently gave the backpack to police officers.

Thomas Johnson Byars, a friend of defendant, saw defendant at his (Mr. Byars') house in South Carolina on Sunday, 4 November 1990. Defendant left on the following Tuesday, telling Mr. Byars that the rental car was due back and that he had to get back in order to vote.

A search of defendant's apartment revealed an array of weapons, a rifle, gun boxes, and ammunition.

While defendant was in prison awaiting trial, he wrote the following letter to his sister:

Shara, look, I planned everything so that you would be in the least danger possible. If you had only simply followed instructions then I wouldn't be in this mess. You were my only lifeline to safety and you failed me. It would have been much safer for both of us if you had only stuck to the plan. You do a person unimaginably more harm by telling them that you're going to do something — that they can count on you — than if you'd simply told them right from the start that you did and didn't have guts enough to do. If you'd only told me in advance. Well, a hell of a lot of good it does now, I guess.

Look, I don't want to go "behind the wall" at Central Prison in Raleigh for a crime I didn't commit. I hate to have to ask you to risk your life like this but, remember, if you'd only done what the hell you agreed to do I wouldn't have to. If I get convicted . . . I want you to get yourself an accomplice, I'll try to get Tony from California, two bulletproof vests, and two of those Ruger 10/22 "assault pistols" like your friend made. Then you can park along Highway #65 somewhere East of here in a discrete [sic] location every day from the time of my conviction. I'll have no way of knowing exactly when they'll be transporting me. Follow the transport van (it doesn't make any stops) and then, at a preselected spot stop in front of it at a natural stop and then both you get out and waste the bastards. I think you know everything I would need, both of us would need at this point to "get the hell out of Dodge and never look back." I hate having to ask something of you like this but, if I don't get bond and all other options fail, I would rather die than go behind the wall for 20 years on account of some bastard I didn't kill. I love you, Shara, but remember I wouldn't have to be asking this of you if you only hadn't chickened out back when it would have been so laughably easy. Please do it, Shara, if it — God forbid — comes to it. I'm not in the least surprised at Marla betraying me, she had a track record of it, after all, but I never dreamed that you would. If I could have even remotely

dreamed it I never would have put my life in your hands the way I did. Love, Bill.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendant.

[1] Defendant first argues that the trial court erred in denying defendant's motion to dismiss at the close of the State's evidence. Defendant contends that the State's evidence was insufficient as a matter of law to support his conviction of first-degree murder. We disagree.

The law regarding denials of motions to dismiss in criminal trials is well settled. This Court reviewed the law in *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980):

> Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.

> If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.

*Id.* at 98, 261 S.E.2d at 117 (citations omitted). In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. *Id.* The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the

defendant is actually guilty.' " *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (alteration in original) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965) ).

Defendant was convicted of first-degree murder. First-degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Judge*, 308 N.C. 658, 303 S.E.2d 817 (1983). The intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice. *Id.* Premeditation may be established by proving that the killing was thought out beforehand for some length of time, however short. *State v. Stone*, 323 N.C. at 451, 373 S.E.2d at 433. Deliberation may be established by proving that defendant intended to kill, that the killing was carried out in a cool state of blood in furtherance of a fixed design for revenge, or that the killing was carried out to accomplish an unlawful purpose not under the influence of passion suddenly aroused by lawful or just cause or legal provocation. *State v. Williamson*, 333 N.C. 128, 133-34, 423 S.E.2d 766, 769 (1992); *State v. Small*, 328 N.C. 175, 181, 400 S.E.2d 413, 416 (1991).

"Premeditation and deliberation may be and is most often proved by circumstantial evidence." *State v. Pridgen*, 313 N.C. 80, 93, 326 S.E.2d 618, 627 (1985). Some of the circumstances from which an inference of premeditation and deliberation can be drawn are:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992).

In applying the foregoing principles of law to the facts of this case, we find no error in the trial court's refusal to dismiss the case at the close of the State's evidence. A review of the evidence in this case supports a reasonable conclusion that the homicide was committed with malice, premeditation, and deliberation and that defendant was the perpetrator of the crime.

## STATE v. BARNES

[334 N.C. 67 (1993)]

Defendant and the victim had previously experienced ill will resulting from the ongoing love triangle involving them and Ms. Rodgers. Defendant had repeatedly threatened the victim's life. A little more than a week before the murder, defendant demanded that Ms. Rodgers meet him at a location down the street from the body shop or he would go to the body shop and kill the victim. When Ms. Rodgers arrived to meet defendant, he said, "Take me to the damn shop. . . . I want to kill that old son-of-a-bitch." Defendant told Ms. Rodgers more than once that she would be "going to a funeral." Defendant was opposed to Ms. Rodgers' abortion, and he told her that the victim "would have the blood of his [defendant's] child on his hands." The victim's dying words to Ms. Rodgers were "[t]hat son-of-a-bitch shot me." The evidence shows that the motive for the killing was not robbery, as the victim had over $1,300 in cash in his wallet.

Defendant's house in Greensboro was a virtual storehouse of weapons and ammunition. In August of 1990, defendant purchased a Browning .22-caliber rifle, which, by pressing a button and turning the barrel counterclockwise, would break down into two separate pieces, thereby making it concealable in a small backpack. The rifle used .22-caliber long-rifle bullets. The rifle's box was found in defendant's house, but the rifle itself was conspicuously absent from defendant's home following the shooting. The victim customarily checked his body shop at night to protect his business interest. The victim was shot on the night of 31 October 1990, and three .22-caliber long-rifle bullets were recovered from the victim's body and clothing. The SBI forensic firearms examiner testified that these bullets could have been fired from the Browning rifle purchased by defendant. Defendant was identified as being in the vicinity of the body shop in Eden, at a place "you rarely see anyone walking," the day before the shooting. The day after the shooting, defendant was seen on wooded farm land behind the body shop, dressed in the same clothes that he had been seen wearing the day prior to the shooting. Defendant lived in Greensboro, not Eden. A blue backpack identified as belonging to defendant was seen in the woods behind the body shop by the same hunters who had seen defendant.

Following the shooting, defendant drove to Virginia and then to South Carolina, leaving his blue backpack in a room used for storage in a cabin in Virginia. While incarcerated, defendant wrote a letter to his sister concerning the crime. He self-servingly says

in the letter that he did not commit the crime. However, in the letter, defendant tells his sister, Shara, that he "planned everything" so that she would be in the least danger possible. He then exhorts her for not following the plan and blames her for the "mess" he is in, telling her that she was his "lifeline" had she only "stuck to the plan." Defendant instructed Shara that if he was convicted, she was to gun down the drivers of the transport van as he was being moved to Central Prison, effectuating his escape.

With regard to the exculpatory statements made by defendant in his escape plan, defendant contends that the State is bound by these exculpatory statements of defendant, because the State has not sufficiently contradicted or rebutted the statements. We disagree.

"When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements." *State v. Carter*, 254 N.C. 475, 479, 119 S.E.2d 461, 464 (1961). The introduction in evidence by the State of a statement made by defendant which may tend to exculpate him[ ] does not prevent the State from showing that the facts concerning the homicide were different from what the defendant said about them.

*State v. Bolin*, 281 N.C. 415, 424-25, 189 S.E.2d 235, 241-42 (1972) (citations omitted). Here, the exculpatory statement of defendant made in the context of his plan to commit murder to effectuate his escape was contradicted and shown to be false by the other facts and circumstances in evidence.

As our recitation of the evidence discloses, we find substantial evidence that defendant was the perpetrator of the crime and that the murder of Jessie Lemons was premeditated. Defendant had both motive and opportunity. The circumstances of this case are more than sufficient to remove this case from the realm of mere suspicion and conjecture. This assignment of error is overruled.

[2] In his remaining assignment of error, defendant contends that the trial court erred by instructing the jury on flight. Defendant argues that the evidence was insufficient to support such an instruction. We disagree.

The trial court, in instructing the jury on flight, outlined the differing contentions:

STATE v. BARNES

[334 N.C. 67 (1993)]

The state contends that the defendant fled the Eden area on November 1, 1990. The defendant denies this. He contends that he was not in the Eden area on October 31, 1990, or on November 1, 1990. Further, the state contends that the defendant planned to flee law enforcement custody after any conviction. On [the] other . . . hand, the defendant contends any idea of fleeing custody was only a conditional plan by a desperate person who was wrongfully charged and wrongfully incarcerated.

The court then instructed the jury on flight substantially as provided in N.C.P.I.— Crim. 104.36, "Flight—First Degree Murder Cases," as follows:

Evidence of flight or evidence of a plan to escape may be considered by you, together with all other facts and circumstances in this case, in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt. Further, such circumstance of flight or plan to escape has no bearing on the question of whether the defendant acted with premeditation and deliberation. Therefore, such evidence must not be considered by you as evidence of premeditation or deliberation.

We find that the evidence in the case *sub judice* clearly supports this instruction. On the day following the shooting, defendant was spotted by hunters in some woods behind the body shop. The next day, defendant arrived at a friend's cabin in Virginia, where he stayed for two days. Then he visited a friend in South Carolina, where he stayed an additional two days. Both out-of-state visitations were unexpected by defendant's friends. After his arrest and while awaiting trial, defendant wrote a letter to his sister planning his escape if convicted. "So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper." *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977). The State's evidence shows that following the shooting, defendant roamed the woods, then stayed in Virginia for two days, and then stayed in South Carolina for another two days. In addition to this evidence, defendant wrote a note to his sister outlining an escape plan. "It

is well settled in this state that an escape from custody constitutes evidence of flight. Evidence of defendant's attempt to escape provides additional support for the trial court's instruction on flight." *State v. Levan*, 326 N.C. 155, 165, 388 S.E.2d 429, 436 (1990) (citations omitted). Here, evidence of defendant's plan to escape likewise supports the trial judge's instruction on flight.

This case is distinguishable from *State v. Lee*, 287 N.C. 536, 215 S.E.2d 146 (1975), relied on by defendant. In *Lee*, an arrest warrant was issued for defendant for robbery, and the sheriff " 'attempted to locate the [d]efendant for the purpose of serving the warrant on him by riding—just by riding and looking for him, didn't ask any questions if anybody had seen him, or anything.' " *Id.* at 538, 215 S.E.2d at 147. The sheriff looked for defendant in this manner for six days, acknowledging that defendant sometimes divided his time between several cities. This Court concluded that the evidence was insufficient in *Lee* to support a flight instruction, reasoning that the sheriff "merely looked for defendant while riding around on the street where defendant lived. He never went to defendant's residence, nor . . . did he make any inquiry as to defendant's whereabouts. This, together with the sheriff's own testimony that defendant customarily frequented other cities, leaves the question of whether defendant did indeed flee or otherwise try to avoid apprehension to utter conjecture, speculation and surmise." *Id.* at 539-40, 215 S.E.2d at 149. In *Lee*, there was simply no evidence that defendant went anywhere after the robbery.

In the case at bar, the evidence placed defendant in a wooded area, then in a cabin in Virginia, and then at a friend's house in South Carolina, for a period of six days after the shooting. Furthermore, defendant devised a plan to escape while in custody, which, like the actual attempt in *Levan*, further supports the flight instruction. Finally, the wording of the instruction itself reveals that defendant has suffered no prejudice. The trial judge carefully worded his flight instruction to the jury so that defendant's contentions were also set out for the jury. Because we find the evidence sufficient to support the instruction on flight, this assignment of error is overruled.

Based upon the foregoing, we conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.