CALABRIA, Judge.
 

 *756
 
 Chalmers Bohannon ("defendant") appeals from a judgment entered upon a jury verdict finding him guilty of felony child abuse inflicting serious bodily injury. For the reasons that follow, we find no error.
 

 *757
 

 I. Background
 

 The State presented evidence that on the evening minor victim A.B.
 
 [1]
 
 sustained injuries, he was approximately three months old and
 
 *784
 
 he lived with his mother, Brittany Fulp ("Fulp"), and his father, defendant, in a small apartment located in Winston-Salem. During the early evening hours of 7 September 2012, Fulp placed A.B. in his crib and he went to sleep. Since A.B. was asleep and defendant was home, Fulp walked to a nearby drugstore. When Fulp returned to the apartment approximately thirty to forty-five minutes later, A.B. was propped up on defendant and Fulp's bed; he was whimpering but was unable to cry. A.B.'s face and chest were bruised, and his eye was swollen. When Fulp asked defendant what happened, he responded that he was not sure. After settling A.B., Fulp laid him down for the night and planned to seek medical assistance if he appeared worse the next day. A.B. slept through the night for the first time in his life. Although Fulp checked on A.B. the following morning, she could not properly assess his condition due to the dim lighting around his crib. Sometime during the evening hours of 8 September 2012, defendant's mother, defendant, and Fulp transported A.B. to the hospital to have his injuries evaluated.
 

 In the pediatric emergency department, A.B. was first assessed by a triage nurse. He was then further examined by Dr. David Klein, an emergency medicine specialist, and Dr. Coker, the chief resident at the hospital. Dr. Klein observed bruising in the following areas: A.B.'s left forehead; the right side of his face going towards the ear; the middle portion of the right side of his face; the upper left chest going toward his shoulder; and the right side of his chest going toward his upper abdomen. When the physicians asked defendant and Fulp what happened to A.B., neither one provided an answer. After remaining in the emergency room for fifteen minutes, defendant left the hospital and went home.
 

 While at the hospital, A.B. underwent a series of diagnostic tests which included a CAT scan and an MRI of his head as well as x-rays of all his bones. Dr. Lauren Golding was the attending pediatric radiologist on duty when A.B. was brought to the hospital on 8 September. She discovered that A.B. had sustained a broken right tibia (i.e., leg fracture ). A.B.'s leg injury was thought to be the result of a "buckle fracture," an injury that occurs when a bone "buckles" after being subjected to
 
 *758
 
 substantial force or pressure. Buckle fractures in infants can result from significant twisting or torqueing of the bone. Follow-up x-ray scans (on 25 September 2012) revealed that A.B. had also sustained a buckle fracture to his left tibia. A.B.'s MRI revealed subarachnoid hemorrhaging consistent with the external bruising on both sides of his brain. Subarachnoid hemorrhages refer to bleeding under the arachnoid, or innermost, layer of the brain. At trial, Dr. Golding testified that bleeding around the brain is a sign of significant trauma and can result in acute illness or death depending on the volume of the bleeding and the increase in intracranial pressure. A.B. was eventually admitted to the hospital for orthopedic surgery, general observation, and physical protection. He was hospitalized for two days.
 

 Since neither Fulp nor defendant could explain what happened to A.B., hospital staff reported suspected child abuse to Forsyth County's Child Protective Services (FCCPS) and local law enforcement. As a result, Winston-Salem Police Officer Aaron Jessup ("Officer Jessup") was dispatched to the hospital, where he found medical staff with A.B. in his room. Officer Jessup then located Fulp in the parking lot where it appeared she was trying to leave. Fulp told Officer Jessup she was not in the room because she was frightened and concerned for defendant. She also reported her version of events from the night of 7 September 2012. After continued questioning, Fulp informed the police officer that defendant was at their apartment. In following up on the information Fulp provided, Officer Jessup went to the family's apartment and interviewed defendant, who stated that he was cooking in the kitchen on the night of 7 September 2012 when A.B. fell off the couch and landed face down on the carpeted floor.
 

 On 10 September 2012, Dr. Meggan Goodpasture, director of the hospital's Child Abuse and Neglect Team, conducted a complete physical exam on A.B. and observed that he had "significant bruising" on his
 
 *785
 
 chest, both cheeks, and his face extending from his left ear to his right ear. Upon A.B.'s release to FCCPS, hospital staff recommended that social workers have A.B. examined by a neurosurgeon in two to three weeks.
 

 On 25 February 2013, the State indicted defendant and charged him with three counts of felony child abuse inflicting serious physical injury. Subsequently, the State offered a plea arrangement pursuant to which defendant could "plead as indicted" or face indictments on additional charges. After defendant rejected the plea offer, the State obtained additional indictments charging him with felony child abuse inflicting serious bodily injury and habitual felon status. The case proceeded to trial and, on 27 March 2014, a jury returned verdicts finding defendant guilty
 
 *759
 
 on two counts of felony child abuse inflicting serious physical injury (a Class E felony) for A.B.'s broken tibias and bruising, and one count of felony child abuse inflicting serious bodily injury (a Class C felony) for A.B's brain injury. The trial court sentenced defendant to 127 to 165 months' imprisonment for the Class C felony and 44 to 65 months for each of the Class E felonies. The three sentences were ordered to run consecutively in the North Carolina Department of Public Safety, Division of Adult Correction. Defendant appeals.
 

 II. Analysis
 

 A.
 
 Motion to Dismiss
 

 Defendant first asserts that the trial court erred by denying his motion to dismiss because the State presented insufficient evidence of a serious bodily injury as required by N.C. Gen.Stat. § 14-318.4(a3). We disagree.
 

 We review a trial court's denial of a motion to dismiss
 
 de novo.
 

 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007). "Upon defendant's motion for dismissal, the question for the [c]ourt is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied."
 
 State v. Fritsch,
 

 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000),
 
 cert. denied,
 

 531 U.S. 890
 
 ,
 
 121 S.Ct. 213
 
 ,
 
 148 L.Ed.2d 150
 
 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 Smith,
 

 186 N.C.App. at 62
 
 ,
 
 650 S.E.2d at 33
 
 (citation omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor."
 
 State v. Rose,
 

 339 N.C. 172
 
 , 192,
 
 451 S.E.2d 211
 
 , 223 (1994),
 
 cert. denied,
 

 515 U.S. 1135
 
 ,
 
 115 S.Ct. 2565
 
 ,
 
 132 L.Ed.2d 818
 
 (1995). Contradictions and discrepancies in the evidence "are for the jury to resolve."
 
 State v. Barnes,
 

 334 N.C. 67
 
 , 75,
 
 430 S.E.2d 914
 
 , 918 (1993).
 

 Felonious child abuse inflicting serious bodily injury is defined by subsection 14-318.4(a3), which provides that
 

 [a] parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious bodily injury to the child or who intentionally commits an assault upon the child which results in any serious bodily injury to the child, or which results in permanent or protracted loss or
 
 *760
 
 impairment of any mental or emotional function of the child, is guilty of a Class C
 
 [2]
 
 felony.
 

 N.C. Gen.Stat. § 14-318.4(a3) (2012). A "serious bodily injury" is a "[b]odily injury that creates a substantial risk of death or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." N.C. Gen.Stat. § 14-318.4(d)(1).
 

 The separate, lesser offense of felonious child abuse inflicting serious physical injury is defined under N.C. Gen.Stat. § 14-318.4(a), which states:
 

 *786
 
 A parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a Class E
 
 [3]
 
 felony, except as otherwise provided in subsection (a3) of this section.
 

 N.C. Gen.Stat. § 14-318.4(a) (2012). A "serious physical injury" is defined as a "[p]hysical injury that causes great pain and suffering. The term includes serious mental injury." N.C. Gen.Stat. § 14-318.4(d)(2).
 

 In order to prove felonious child abuse inflicting serious bodily injury, the State must prove that: "(1) the defendant was the parent of the child; (2) the child had not reached [sixteen years of age]; and (3) the defendant intentionally and without justification or excuse inflicted serious bodily injury."
 
 State v. Wilson,
 

 181 N.C.App. 540
 
 , 543,
 
 640 S.E.2d 403
 
 , 405-06 (2007). "[W]hen an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries."
 
 State v. Liberato,
 

 156 N.C.App. 182
 
 , 186,
 
 576 S.E.2d 118
 
 , 120-21 (2003).
 

 In the instant case, it is undisputed that defendant is A.B.'s father and that A.B. is less than sixteen years of age. Defendant had exclusive
 
 *761
 
 custody over A.B. at the time that A.B. was injured, and defendant does not challenge that he intentionally caused those injuries. Therefore, the only remaining issue is whether A.B.'s subarachnoid hemorrhaging constitutes a " serious bodily injury" under N.C. Gen.Stat. § 14-318.4(d)(1).
 

 This Court has previously noted that "the definition of 'serious bodily injury' in this statute mirrors the definition of the same in [N.C. Gen.Stat.] § 14-32.4 [,]" our assault inflicting serious bodily injury statute.
 
 State v. Lowe,
 

 154 N.C.App. 607
 
 , 615,
 
 572 S.E.2d 850
 
 , 856 (2002). In the context of our assault statute, the term "requires proof of more severe injury than the 'serious injury' element of [assault with a deadly weapon with intent to kill or inflicting serious injury]."
 

 Id.
 

 However, neither subdivision 14-318.4(d)(1) nor case law further define the term in the context of felonious child abuse, nor do they explain what constitutes a "substantial risk of death."
 
 See
 
 N.C. Gen.Stat. § 14-318.4(d)(1). Even so, it is clear that subsection 14-318.4(a3) is violated whenever a parent or caretaker inflicts a bodily injury on a minor that "creates" such a risk.
 
 See
 
 id.
 

 As a result, the age and particular vulnerability of a minor victim must factor into this analysis.
 

 Defendant argues "the State failed to present evidence that the bleeding [around A.B.'s brain] created 'a substantial risk of death' or caused 'serious permanent disfigurement, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ,' or resulted in 'prolonged hospitalization.' " According to defendant, since A.B. did not actually suffer acute consequences from his subarachnoid hemorrhages, his brain injury never presented a substantial risk of death. In making this argument, defendant portrays A.B.'s hospitalization as one based on "protection," not "treatment," and he notes that A.B. was released only "with a prescription for Tylenol, if needed." Based on this characterization of the evidence, defendant asks us to remand for entry of judgment on the lesser offense of felony child abuse inflicting serious physical injury.
 

 In response, the State contends that this Court's holding in
 
 State v. Wilson,
 

 181 N.C.App. 540
 
 ,
 
 640 S.E.2d 403
 
 (2007) should control our analysis in this case.
 
 Wilson
 
 is distinguishable, however, because the defendant in that case challenged the sufficiency of the evidence proving "that [she] intentionally abused her child[,]" rather than the evidence offered to prove a serious bodily injury.
 

 Id.
 

 at 542
 
 ,
 
 640 S.E.2d at 405
 
 . Furthermore, the
 
 Wilson
 
 defendant was convicted of a single count of felonious child abuse inflicting serious bodily injury for a series of injuries
 
 *787
 
 including first and second degree burns caused by scalding water and cigarette butts; "chronic signs of neglect"; and a blood clot
 
 *762
 
 appearing on the right side of the child's brain.
 

 Id.
 

 at 541
 
 ,
 
 640 S.E.2d at 401
 
 . By contrast, in the instant case, defendant was convicted of three counts of felonious child abuse-two inflicting serious physical injury (for the fractured tibia and bruises appearing on A.B.'s face, ear, and chest), and one inflicting serious bodily injury (for the subarachnoid hemorrhages ). Consequently, the "serious bodily injury" in
 
 Wilson
 
 was actually a series of injuries that included a subdural hematoma, rather than the brain injury alone.
 

 Although
 
 Wilson
 
 does not control our analysis in this case, we nevertheless hold that there was sufficient evidence to submit to the jury the question of whether A.B. suffered a serious bodily injury. Our examination of the record evidence, considered in the light most favorable to the State, shows that A.B. was a normal, healthy baby who had no prior medical problems. Dr. Klein, the attending physician in the hospital's pediatric emergency department on 8 September 2012, testified about his examination of A.B. He stated that a CAT scan revealed an abnormality in A.B.'s skull, but the radiologist could not determine at that time whether "that was a separation due to a break [in the skull] or a separation due to a slow closing of those bones" forming the area commonly referred to as the "soft spot" on a baby's head. After A.B. was admitted to the hospital, Dr. Golding examined A.B.'s MRI, which revealed multiple areas of hemorrhaging on his brain. Dr. Golding testified that bleeding on the brain could lead to a number of issues, including "developmental delays" or even "acute illness and death" when there is significant volume and increasing intracranial pressure. Similarly, Dr. Goodpasture testified that bleeding around the brain is "certainly a sign of serious trauma" that, in infants, can cause "irritability, seizures, and ... even ... life-threatening events[.]" Although the subarachnoid hemorrhaging did not appear to be immediately life-threatening when A.B. was evaluated at the hospital, Dr. Goodpasture stated that it is very difficult to predict the full effect of brain injuries in infants because "an infant's brain at this time is growing and developing a tremendous amount, and ... injury to their brain at this age could be more traumatic or damaging than to [an adult's]." She further testified that A.B.'s brain injury would require him to be continuously monitored for dangerous side effects down the road. Defendant did not offer any evidence.
 

 When viewed in the light most favorable to the State, the evidence was sufficient to withstand defendant's motion to dismiss. More specifically, based on the facts of this case, we believe the record demonstrates that A.B.'s brain injury created a substantial risk of his death. The evidence suggests that defendant intentionally inflicted serious trauma to the head of A.B., thereby causing subarachnoid hemorrhaging. Indeed,
 
 *763
 
 the force was so strong as to crack A.B.'s skull, or at the very least, cause bleeding in the brain of an infant so young that his "soft spot" had not yet closed. This significant, internal bleeding clearly had the potential to kill A.B. and that risk was created when the brain injury was inflicted. The dangers inherent in such a situation-one where some action or mechanism delivered multiple, vicious blows to a three-month-old baby's skull-could be inferred by the fact finder as a matter of common knowledge. Given the uncontroverted testimony of three expert witnesses who personally treated A.B., we conclude that there was sufficient evidence from which a reasonable jury could find that A.B.'s brain injury constituted a "serious bodily injury" in accordance with N.C. Gen.Stat. § 14-318.4(a3). Thus, the trial court did not err in denying defendant's motion to dismiss due to insufficiency of the evidence.
 

 B.
 
 The State's Closing Argument
 

 Defendant next argues that the trial court erred in failing to intervene
 
 ex mero motu
 
 during the State's closing argument. We disagree.
 

 Initially, we note that defendant did not object to the State's closing at trial.
 

 The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing
 
 *788
 
 counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu.
 
 Under this standard, only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting
 
 ex mero motu
 
 an argument that defense counsel apparently did not believe was prejudicial when originally spoken. Defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.
 

 State v. Jones,
 

 231 N.C.App. 433
 
 , 437,
 
 752 S.E.2d 212
 
 , 215 (2013) (internal citations, quotation marks, and brackets omitted),
 
 disc. review denied,
 

 367 N.C. 322
 
 ,
 
 755 S.E.2d 616
 
 (2014).
 

 It is well established that "[s]tatements made during closing arguments to the jury are to be viewed in the context in which the remarks are made and the overall factual circumstances to which they make reference."
 
 State v. Harris,
 

 236 N.C.App. 388
 
 , 399,
 
 763 S.E.2d 302
 
 , 311 (2014) (citation omitted). "As a general proposition, counsel are allowed wide latitude in closing arguments, so that a prosecutor is entitled to argue
 
 *764
 
 all reasonable inferences drawn from the facts contained in the record."
 

 Id.
 

 (citations omitted). "Unless the defendant objects, the trial court is not required to interfere
 
 ex mero motu
 
 unless the arguments stray so far from the bounds of propriety as to impede the defendant's right to a fair trial."
 
 State v. Small,
 

 328 N.C. 175
 
 , 185,
 
 400 S.E.2d 413
 
 , 418 (1991) (quotation marks and citations omitted). Nor is the trial court required "to intervene
 
 ex mero motu
 
 where a prosecutor makes comments during closing argument which are substantially correct shorthand summaries of the law, even if slightly slanted toward the State's perspective."
 
 State v. Barden,
 

 356 N.C. 316
 
 , 366,
 
 572 S.E.2d 108
 
 , 140 (2002) (citation omitted). Moreover, a prosecutor's misstatement of the law may be cured by the trial court's subsequent correct instructions.
 

 Id.
 

 Here, defendant challenges the following statement made by the prosecutor during her closing argument:
 

 And I contend you've heard evidence from Dr. [Klein], Dr. Golding, and Dr. Goodpasture about the concerns about infants having subarachnoid hematoma [sic] or bleeding in the subarachnoid space; that infants are particularly vulnerable when they're this age, and that that kind of bleeding can lead to death, developmental delays, you know, brain disfigurement, a number of things; so much so that they have to monitor infants for a significant period of time to make sure that they develop normally and that they meet their milestones. And so what's required in that is a substantial risk. The State is not required to prove that [A.B.] actually suffered death or disfigurement or whatever. But I would contend to you that if you have a bleed in your brain, which is the organ that controls all your bodily functions, that that bleeding can lead to swelling, which cuts off oxygen, which could lead to death, which could lead to impairment, which could lead to delays, all kinds of significant problems down the road.
 

 Defendant argues that this statement "misrepresented the State's burden of proof and asked the jury to find that [A.B.] suffered a 'serious bodily injury' if it concluded that there was
 
 some possibility
 
 of future impairment or disfigurement." Further, defendant argues that the trial court's failure to intervene and correct the State's misrepresentations deprived defendant of his right to a fair trial.
 

 During closing argument, the prosecutor stated that she must prove "substantial risk" that "could lead" to prolonged or permanent injuries. The jury charge, however, clarified the law and the State's burden of proof:
 

 *765
 
 The defendant has been charged with Felonious Child Abuse Inflicting Serious Bodily Injury. For you to find the defendant guilty of this offense, the State must prove three things beyond a reasonable doubt: ... And third, that the defendant intentionally inflicted a serious bodily injury to the child or intentionally assaulted the child which proximately resulted in serious bodily injury to the child.
 

 *789
 
 A serious bodily injury is defined as a bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ or that results in prolonged hospitalization.
 

 Both the State and defendant approved the jury charge before it was delivered. Moreover, following a question from the jury, the judge clarified the definitions of "serious bodily injury" and "serious physical injury" under the statute. This request for clarification manifested the jury's understanding that the State's burden of proof for the charge stemming from A.B.'s head injury was different than those related to his bruises and broken tibias. Given the opportunity to convict defendant of the lesser charge of felonious child abuse inflicting serious physical injury, the jury nevertheless determined that A.B.'s subarachnoid hemorrhaging constituted a "serious bodily injury."
 

 In light of the "overall factual circumstances" of this case,
 
 Harris,
 

 236 N.C.App. at 399
 
 ,
 
 763 S.E.2d at 311
 
 , we conclude that the prosecutor's closing arguments were not "so grossly improper" as to "infect[ ] the trial with unfairness" and "render[ ] the conviction fundamentally unfair."
 
 Jones,
 

 231 N.C.App. at 437
 
 ,
 
 752 S.E.2d at 215
 
 . Therefore, the trial court did not err by failing to intervene
 
 ex mero motu
 
 to address the prosecutor's allegedly improper closing remarks.
 

 III. Conclusion
 

 Based on the foregoing analysis, we hold that the trial court did not err in denying defendant's motion to dismiss for insufficient evidence the charge of felonious child abuse inflicting serious bodily injury. Additionally, we hold that the trial court did not err in failing to intervene
 
 ex mero motu
 
 during the prosecutor's closing argument.
 

 NO ERROR.
 

 Judges BRYANT and ZACHARY concur.
 

 [1]
 

 The minor victim's initials will be used to protect his identity in conformity with N.C. R.App. P. 3.1(b) and 4.
 

 [2]
 

 2013 N.C. Sess. Law 35, section 1, effective 1 December 2013, upgraded a violation of N.C. Gen.Stat. § 14-318.4(a3) from a Class C felony to a Class B2 felony. Defendant was properly indicted and convicted under the statute as it existed at the time of A.B.'s injuries.
 

 [3]
 

 2013 N.C. Sess. Law 35, section 1, effective 1 December 2013, upgraded a violation of N.C. Gen.Stat. § 14-318.4(a) from a Class E felony to a Class D felony.