IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-456

Filed 3 December 2025

Mecklenburg County, Nos. 21CR215016-590, 21CR215017-590

STATE OF NORTH CAROLINA

v.

ROGELIO ROJAS CRUZ

Appeal by Defendant from judgment entered 26 February 2024 by Judge Peter B. Knight in Mecklenburg County Superior Court. Heard in the Court of Appeals 18 November 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Lauren Clemmons, for the State-Appellee.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for Defendant-Appellant.*

COLLINS, Judge.

Defendant Rogelio Rojas Cruz appeals from judgment entered upon a jury's guilty verdict of one count of statutory sex offense with a child by an adult and one count of indecent liberties with a child. Defendant argues that the trial court erred by denying his motion to dismiss the charge of statutory sex offense with a child by an adult at the close of evidence. Because the State presented sufficient evidence of all of the requisite elements of the offense, the trial court did not err by denying Defendant's motion to dismiss for insufficient evidence. We find no error.

## I.    Background

Defendant was indicted on 24 May 2021 on one count of statutory sex offense with a child by an adult and one count of indecent liberties with a child.  The case came on for jury trial on 5 February 2024.  The evidence presented at trial tended to show the following:

### A.  State's Evidence

#### 1.  Daniela's Testimony

In or around August 2020, Daniela was living in Charlotte, North Carolina with her husband, Martin (together, the "Parents"), and their two minor children: Sarah (born in November 2015) and Nate.[1]  On 15 August 2020, the Parents asked Martin's sister, Wendy, to watch Sarah and Nate while the Parents attended a wedding in Chapel Hill, North Carolina.  Wendy also lived in Charlotte with her husband, Hector, and their three minor children.  The Parents dropped their kids off at Wendy's house around noon on 15 August 2020, and Wendy told them that she and her husband were going to take Sarah, Nate, and their children to a gathering at Defendant's house.  Defendant is Hector's father and Wendy's father-in-law.

The Parents checked in with Wendy regularly throughout the day.  They picked Sarah and Nate up from Wendy's house around midnight; Sarah and Nate were awake and seemed normal.  The next morning, 16 August 2020, Daniela was

---

[1] We use pseudonyms to protect the identity of minor children.  *See* N.C. R. App. P. 42.

sitting on her back porch with Sarah when Sarah disclosed to her "that her [p]rimos' grandfather touched her colis." Sarah knew Defendant as her cousins' grandfather; "primos" means "cousins" in English. Daniela further testified that Sarah, who was four years old at the time, "didn't know the word 'vagina,' but she did know how to specify the area." "Colis" was the word Sarah used to describe her vagina.

Daniela immediately began recording her conversation with Sarah on her phone. On video, Sarah repeated what she had disclosed to Daniela. This video was introduced into evidence.

Later that day, the Parents took Sarah to the hospital, and they brought with them in a plastic bag the blue underwear that Sarah had been wearing the day before. At the hospital, Sarah was examined by doctors, and the Parents spoke to law enforcement officers. The hospital recommended that they take Sarah to Pat's Place Child Advocacy Center, which is a "support place for children that have been sexually abused." The Parents took Sarah to Pat's Place the next day.

### 2. Sarah's Testimony

At the time of trial, Sarah was eight years old. When asked why her parents took her to the hospital on 16 August 2020, Sarah responded,

> A: I went to the doctor because my cousins' grandfather was touching my inappropriate part.
>
> Q: . . . So when you say "inappropriate part" of your body, are you referring to a part that you use to go to the bathroom?

A:     Yes.

Q:     Is that the front part or the back part?

A:     The front part.

### 3. *Martin's Testimony*

Martin testified that prior to 15 August 2020, he and Daniela had left his children in Wendy's care many times; the two families were very close and spent a lot of time together. He recounted that on the morning of 16 August 2020, when his wife called him to come out onto the back porch, "[Sarah] repeated what happened. And as soon as she repeated it, I got on the phone. I called Wendy, and I said, you need to come to my house right now. We need to talk." Wendy, Hector, and their children showed up a short time later. Sarah repeated what happened to Wendy and Hector, and Wendy suggested they go to the hospital.

Martin further testified, "My daughter had said that after she got touched, she went to the bathroom to wipe herself off and there was blood on the toilet paper."

### 4. *Nurse Ashlyn Beeman's Testimony*

Ashlyn Beeman is a registered nurse with a primary concentration in pediatrics. She was tendered and admitted as an expert in forensic and pediatric nursing. In August 2020, Beeman was working as a "sexual assault nurse examiner" at Atrium Health Levine Children's Hospital in Charlotte, North Carolina. She completed a physical exam of Sarah on 16 August 2020 and documented her findings in a written report. This documentation was entered into evidence, and Beeman

testified about its contents.

According to Beeman's written report, when she asked Daniela what brought them to the hospital, Daniela responded, "I was sitting on my back porch and [Sarah] came to me and told me, quote, my cousins' grandpa touched my colis." Daniela further told Beeman, "I kept telling her she would not get in trouble. Then she told me that her cousins' grandpa put his fingers in her and it hurt a lot. She said she went to the bathroom, and when she wiped herself there was blood."

Beeman then met with Sarah, and based on Beeman's written report, the following colloquy ensued:

> I asked, "Do you know why you are here today?"
>
> [Sarah] said, "No."
>
> I asked, "Did anything happen yesterday that you want to tell me about?"
>
> [Sarah] said, "We went to my cousins' grandparents house and he touched me on the cheek -- in the cheek with his fingers, and he put his fingers in my colis and, quote, it hurt."

During her physical exam of Sarah, Beeman found redness on the hymen tissue and a 0.25 millimeter laceration located at the bottom of Sarah's labia minora that went into the vagina. Beeman testified that Sarah's injuries—the redness and laceration—were visible to the naked eye. Photos of the injury were introduced into evidence for illustrative purposes. Beeman testified that based on her experience and training, Sarah's injuries were consistent with blunt force trauma, and nothing about

her physical examination of Sarah led Beeman to doubt the report given by Daniela and Sarah as to what happened.

### 5. *Forensic Interviewer Abbie DiIanni's Testimony*

Abbie DiIanni is employed as a coordinator of forensic services at Pat's Place, which is a "center where kids go when there is an allegation of child abuse or neglect." DiIanni was tendered and admitted, without objection, as an expert in forensic interviewing and child abuse assessments.

DiIanni first interviewed Sarah on 17 August 2020. According to DiIanni, Sarah "reported that her colis was broken." Sarah identified that part of her body by pointing to it. The video of this interview was introduced into evidence for illustrative purposes. Sarah presented as "very normal" during this interview and often tried to change the subject to avoid talking about the alleged assault. Overall, Sarah was not very responsive during this interview, which, DiIanni testified, was not uncommon:

> [I]f a child is just presenting as like this has been enough, gone on enough, especially with the little ones, we want to be really sensitive to that. So we, with our little ones, it is not atypical for us to do a follow-up interview or a second-session interview based on the age and the needs of the child.

DiIanni interviewed Sarah for a second time on 30 March 2021. At this point, Sarah was five years old. DiIanni testified,

> [Sarah] reported that her cousin's grandpa put his, in quotes, whole finger into her colis. She again identified that part of her body by pointing to it and reporting that it hurt. She reported that her pants were down when this

happened. And I believe also described how her undergarments were down. She reported that she had wiped herself and there was blood on the paper.

This second interview was also recorded and introduced into evidence for illustrative purposes.

### 6. *DNA Analyst Shannin Guy's Testimony*

Shannin Guy worked as a DNA analyst for the Charlotte Mecklenburg Police Department in the crime lab. She was tendered and admitted, without objection, as an expert in forensic DNA analysis.

Guy testified, "The case narrative I received indicated there was digital penetration." Guy analyzed Sarah's sexual assault kit which included Sarah's buccal standard, her external genitalia swab, and Sarah's left and right hand fingernail swabs. Guy also swabbed various areas of the underwear Sarah was wearing the day of the alleged assault, including the inside front panel, waistband, back panel, and crotch area.

All of the parts of the underwear that Guy tested detected male DNA. Guy then conducted YSTR DNA testing, which specifically targets male DNA. Guy testified, "The partial YSTR DNA profile obtained from the extract from the swabs from the front inside panel of the -- and waistband of the underwear was consistent with the YSTR DNA profile obtained from [Defendant]." Guy did not find any other indication of other male DNA profiles in this sample. Furthermore, Guy opined "that [Defendant] or his paternal male -- his paternal male relative cannot be excluded as

a source of this profile."

At the conclusion of Guy's testimony, the State rested its case.

**B. Defendant's Evidence**

At the close of the State's evidence and before putting on his own evidence, Defendant moved to dismiss, arguing that the State failed to present sufficient evidence of each element of the offenses charged; the trial court denied the motion. Defendant then informed the trial court that he intended to put on evidence and testify in his own defense.

Defendant testified that on 15 August 2020, he spent several hours grilling and drank "about four or five beers." After he was done grilling, he drank two or three additional beers before falling asleep at a table. Defendant testified that he did not wake up until the next morning. According to Defendant, he was never alone with Sarah, and he never touched her inappropriately.

Hector, Defendant's son and Wendy's husband, also testified on Defendant's behalf. He corroborated Defendant's story that Defendant had several drinks before eventually falling asleep in his chair. Hector testified that he and his wife helped Defendant get to his bed before leaving Defendant's house around 10:00 p.m. on 15 August 2020. According to Hector, Sarah was crying because she had misplaced her shoes and her socks were wet. Defendant's wife gave Sarah dry socks, and Defendant came downstairs briefly to say goodbye. Hector testified that Sarah was "whiney," "but as soon as [they] got in the car and drove off, she was good . . . ."

Defendant's wife, Defendant's granddaughter, and Wendy also testified on Defendant's behalf.

## C. Jury's Verdict

At the close of all evidence, Defendant renewed his motion to dismiss, arguing that "[t]he State has not met its burden of proving each element beyond a reasonable doubt." The trial court denied Defendant's motion.

On 19 February 2024, the jury returned guilty verdicts on both charges. The trial court consolidated the convictions into one judgment and sentenced Defendant to an active term of 300 to 420 months' imprisonment. The trial court also ordered Defendant to register as a sex offender for a period of thirty years.

Defendant appeals.

## II. Discussion

Defendant argues that the trial court erred by denying Defendant's motion to dismiss the charge of statutory sex offense with a child because the State presented insufficient evidence of penetration, an essential element of the charge under N.C. Gen. Stat. § 14-27.20(4). Defendant's argument lacks merit.

This Court reviews the denial of a motion to dismiss for insufficient evidence de novo. *State v. Crockett*, 368 N.C. 717, 720 (2016). Under a de novo review, the appellate court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33 (2008) (quotation marks and citations omitted).

"The question for a court on a motion to dismiss for insufficient evidence is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Tucker*, 380 N.C. 234, 236-37 (2022) (quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion"; it must be "more than a scintilla of evidence." *State v. Burns*, 278 N.C. App. 718, 721 (2021) (quotation marks and citation omitted); *Tucker*, 380 N.C. at 237.

"In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Barnes*, 334 N.C. 67, 75 (1993) (citation omitted). We must "disregard[] defendant's evidence unless [it is] favorable to the State." *Tucker*, 380 N.C. at 237 (quotation marks and citation omitted). Any contradictions or discrepancies in the evidence "do not warrant dismissal of the case but are for the jury to resolve." *Barnes*, 334 N.C. at 75 (citation omitted).

"Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452 (1988) (citation omitted).

> If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the

> jury to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty.

*Barnes*, 334 N.C. at 75-76 (cleaned up). In other words, "[w]hen ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence." *State v. Fritsch*, 351 N.C. 373, 379 (2000) (citation omitted).

"A person is guilty of statutory sexual offense with a child by an adult if the person is at least 18 years of age and engages in a sexual act with a victim who is a child under the age of 13 years." N.C. Gen. Stat. § 14-27.28(a) (2021). A "sexual act" is defined as "the penetration, however slight, by any object into the genital or anal opening of another person's body." *Id.* at § 14-27.20(4) (2021). The term "any object" includes parts of the human body, such as fingers. *See State v. Lucas*, 302 N.C. 342, 346 (1981) (concluding that "the Legislature did not intend to limit the meaning of the words 'any object' to objects foreign to the human body"). At trial, "[t]he State may elicit evidence of penetration from the victim" as well as "additional corroborative evidence of actual penetration." *In re J.D.*, 376 N.C. 148, 157 (2020) (citations omitted).

Here, the State presented substantial evidence supporting the element of penetration. Sarah testified that Defendant touched her "inappropriate part," which she indicated meant her vagina. When asked what part of Defendant's body he used to touch Sarah's body, Sarah responded, "His hand." Both of Sarah's parents testified

that Sarah had told them that Defendant touched her vagina. Martin, Sarah's father, testified, "My daughter had said that after she got touched, she went to the bathroom to wipe herself off and there was blood on the toilet paper."

Beeman, a registered nurse, testified to the following: Sarah told her parents "that her cousins' grandpa put his fingers in her and it hurt a lot." Sarah told Beeman that Defendant "put his fingers in [her] [vagina] . . . ." Sarah told a forensic interviewer at Pat's Place "that her cousins' grandpa put his, in quotes, whole finger into her [vagina]."

Beeman completed a physical examination of Sarah at the hospital and found redness on her hymen tissue and a laceration located at the bottom of Sarah's labia minora that went into her vagina. *See Burns*, 278 N.C. App. at 722 ("This Court has concluded that . . . [evidence] of being touched in between the labia is sufficient evidence to survive a motion to dismiss by the defendant."). Beeman further testified that Sarah's injuries were consistent with blunt force trauma, and based on her examination of Sarah, Beeman had no reason to believe that the story Sarah and her Parents provided was false.

Finally, the State's expert in DNA analysis, Shannin Guy, testified that she analyzed Sarah's sexual assault kit as well as the underwear Sarah was wearing during the alleged assault. Guy testified that the DNA profile obtained from the front inside panel of Sarah's underwear "was consistent with the [] DNA profile obtained from [Defendant]."

Accordingly, the State presented sufficient evidence by offering the victim's testimony that she was touched by Defendant and corroborating testimony from her mother, her father, the nurse that examined her at the hospital, and the forensic interviewer who interviewed her. According to Beeman and DiIanni, Sarah said that Defendant had put his fingers inside her vagina. *See State v. Corbett*, 264 N.C. App. 93, 99 (2019) (determining that victim testimony of penetration, alone, is sufficient evidence of the element of penetration). The State further presented evidence suggesting the presence of Defendant's DNA on the inside of Sarah's underwear. We therefore conclude that the State's evidence supporting the element of penetration "is sufficient for jury consideration" on whether Defendant committed the offense of statutory sex offense with a child by an adult. *Fritsch*, 351 N.C. at 379 (citation omitted).

### III. Conclusion

For the foregoing reasons, the trial court did not err by denying Defendant's motion to dismiss at the close of evidence.

NO ERROR.

Judges ARROWOOD and HAMPSON concur.