STATE OF NORTH CAROLINA v. DAVEY LYNN BENSON

No. 420A91

(Filed 25 June 1992)

1. **Homicide § 277 (NCI4th) — felony murder — robbery — sufficiency of evidence**

   The trial court did not err by denying defendant's motion to dismiss the charge of first degree murder based on felony murder where the evidence of defendant's presence at the scene around the time of the victim's death, while not unequivocal, was strong; there was strong evidence that defendant had a motive for committing the robbery-murder in his great desire to reconcile with his girlfriend and child and his feeling that obtaining a large amount of cash quickly was the only means to that end; defendant was aware that the victim carried a large amount of money on his person and that it would be easy to forcibly obtain the money because of the victim's advanced age; and defendant had often spoken of the ease with which the crime could be committed, stating that the victim could easily be hit on the head and have his money taken, the modus operandi employed in the actual murder.

   **Am Jur 2d, Homicide §§ 72, 442.**

2. **Evidence and Witnesses §§ 3110, 3111 (NCI4th) — felony murder — corroborating testimony going beyond original — broadside objection — assignment of error waived — no prejudicial error**

   Defendant's failure to specify the nature of his objection did not waive his assignment of error to corroborative testimony regarding statements made to a cellmate which went beyond the original, but his failure to object to the allegedly incompetent portions of the testimony did waive the assignment of error. Any error was cured by the trial court's instruction and, given the substantial evidence against defendant, there was no reasonable possibility that the jury would have reached a different result absent any error.

   **Am Jur 2d, Homicide §§ 559, 560.**

3. **Evidence and Witnesses §§ 3110, 3106 (NCI4th)— felony murder—corroborating testimony going beyond original— broadside objection—assignment of error waived—evidence admissible**

Defendant's failure to specify the nature of his objection did not waive his assignment of error to corroborative testimony regarding statements made before the crime which went beyond the original, but his failure to object to the allegedly incompetent portions of the testimony did waive the assignment of error. Assuming the assignment of error was properly preserved, the testimony was properly admitted because the variation was modest and went only to the weight of the testimony.

**Am Jur 2d, Homicide §§ 559, 560.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment upon defendant's conviction of first-degree murder entered by *Jenkins, J.*, at the 11 March 1991 session of Superior Court, JOHNSTON County. Heard in the Supreme Court 16 April 1992.

*Lacy H. Thornburg, Attorney General, by Clarence J. DelForge, III, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for the defendant-appellant.*

MEYER, Justice.

On 11 December 1989, defendant, Davey Lynn Benson, was indicted for the first-degree murder of Joe F. Horne. On 14 January 1991, a second indictment was issued charging defendant with the robbery with a dangerous weapon of the same victim. Defendant was tried noncapitally for the murder.

The facts pertinent to our decision in this case are as follows. At approximately 8:30 a.m. on the morning of 19 July 1989, Donnie Lee Boykin sat with defendant in an outdoor meeting area in the community of Moore Schoolhouse. Defendant told Boykin that he had recently broken up with his girlfriend, Michelle Hiatt, and that Hiatt and the couple's daughter, Brandy, were living with Hiatt's mother in Kenly. Defendant expressed a desire to visit the two in Kenly but said he lacked money, having only fourteen

cents in his pocket. Defendant asked Boykin for gas money for his moped, and Boykin replied that he did not have any money.

Shortly thereafter, Boykin and defendant observed Joe "Chunk" Horne, an eighty-five-year-old resident of Moore Schoolhouse, walk past the meeting area. Mr. Horne, a survivor of the great depression of the 1930s, was known to customarily carry large amounts of cash on his person because he distrusted banks. The money included denominations of hundreds, fifties, twenties, tens, fives, and ones. Two months earlier, Mildred Deans, Mr. Horne's daughter, witnessed Mr. Horne count his savings; the amount was estimated to be in excess of $16,000. Mr. Horne carried some of his money in his wallet in his left hip pocket and the rest rolled up in a plastic bag in his right hip pocket. According to Boykin, defendant stated something to the effect that Mr. Horne "had a lot of money on him . . . [,] if somebody didn't rob him or knock him in the head or something." Boykin replied that Mr. Horne had "been mighty lucky he'd been this long and carried it with him and never been hit." Boykin testified that on previous occasions defendant had remarked about Mr. Horne's practice of carrying large amounts of money and that defendant would like to obtain it. According to Boykin, as Mr. Horne passed by, he told Boykin and defendant that he intended to go fishing that day at his favorite fishing spot, Atkinson Mill, a popular nearby fishing destination. Boykin also testified that defendant took with him three or four full Budweiser beer cans when defendant left the meeting area at approximately 9:45 a.m.

Christy Deans Pearce, Mr. Horne's granddaughter, gave Mr. Horne a ride to Atkinson Mill that morning. As he stepped out of the car at approximately 9:30 a.m. at the Mill, Mr. Horne had three fishing poles and a white, five-gallon bucket that he sat on while fishing. Ms. Pearce noticed the usual bulge in Mr. Horne's pocket caused by the money he carried. While on her way home from work that same day, Ms. Pearce stopped by Atkinson Mill to pick up her grandfather. Calling for him but receiving no reply, she thought he had obtained a ride from a friend or other family member, which was not uncommon. She returned with her boyfriend a number of hours later to search for him again. As they approached the area, the two saw on the ground a number of fish with torn mouths, as if they had been stripped off a fish stringer. As they continued, they saw a dirty, torn cloth on the trail, which was later identified as Mr. Horne's shirt. Upon arriving at the river,

they saw Mr. Horne lying in the water without his shirt, and the white bucket and fishing poles were floating nearby. Vertical scars and abrasions were visible on Mr. Horne's back, indicating that he had been dragged on the ground. Mr. Horne was also missing his right boot. His pants were pulled down below his knees, but the belt was still buckled.

When the authorities arrived, Mr. Horne was pronounced dead; the body's condition indicated that he had been deceased for some time, but no exact time of death was determined. No money was found on Mr. Horne's person, and his body showed indicia of a severe beating about the head and face with a flat, blunt object. An autopsy revealed additional trauma to the throat consistent with strangulation and several bruises on the back of the hand that were likely defensive wounds. The cause of death was brain trauma due to a blow or blows of a blunt instrument to the head.

At the murder scene, there was a three or four foot wide "drag trail," where leaves had been disturbed, leading to the river. The point of origin of the trail was a wooded area where there were several fish with torn mouths lying on the ground and a felled pine tree that was splattered with blood. There was also blood on the ground around the fish. Six or eight feet from the fish, a slate rock about the size of a man's hand was found; the rock appeared to have blood on it. Five or six steps down the drag trail, Mr. Horne's right boot was found lying on the ground. Nearby, there was a pool of blood. About six feet away, there was another pool of blood measuring the size of a man's hand, with an indentation in the blood. At various locations throughout the murder scene there were Budweiser beer cans.

At approximately 5:30 p.m. that same day, defendant saw his brother, Danny Curtis Benson, and told him that he wanted to get back together with Michelle Hiatt. Defendant told his brother that he would give him $400.00 if Danny could persuade Hiatt to return. Defendant also stated that he would give Hiatt $1,000 and a new car. Danny Benson testified that he was surprised by this offer because he knew that only two days earlier defendant had to borrow five dollars from Hiatt. When Danny asked defendant where he had obtained the money, defendant stated that he acquired it by selling drugs around Kenly. Defendant then pulled from his pocket a wad of money one-half an inch thick with a one hundred dollar bill on top. Danny also testified that a few

days later defendant took six persons, including Danny, Hiatt and Brandy, out to dinner and paid the bill with a one hundred dollar bill. Evidence was also adduced showing that defendant rented a mobile home on 3 August 1989, paying a cash deposit of $150.00 plus a month's rent of $175.00, and bought two bottles of propane gas for $54.00. Two of the bills defendant used to pay these sums were one hundred dollar bills. Evidence was presented that defendant started working as a day laborer for a local farmer for $4.00 an hour on 20 July 1989, the day after Mr. Horne's death, and earned a total of $160.00 at the time he quit on 2 August 1989.

Testimony was also presented by eight persons who stated that defendant had stated on numerous occasions how easy it would be to strike Mr. Horne on the head and take his money. Other testimony placed defendant and his moped, which was silver and black, at the murder scene itself. Carl Smith testified that he was in the Atkinson Mill area on the day of the murder between twelve noon and three in the afternoon and saw a young white male in his twenties working on a disabled moped. On his return trip, Mr. Smith considered stopping to render assistance but decided not to do so because he was taken aback by the behavior of the young man who at that time was rolling around in the grass with his hands and feet in the air appearing very happy and laughing about something.

Donald Pearce, then the boyfriend of Christy Deans Pearce, testified that he saw defendant on three separate occasions on the day of the murder. He saw defendant on a black and gray moped between 9:30 and 10:00 a.m. Defendant was neatly dressed, as was customarily the case. Some time between 3:30 and 4:30 p.m., Pearce saw defendant tinkering with his moped near the roadside. At this time, defendant appeared disheveled; his shirttail was half pulled out, his tennis shoes were dirty, and he did not look as neat as he typically appeared. In addition to witnesses Pearce and Smith, several other persons testified that they saw defendant or someone that looked like him at Atkinson Mill on the day of the murder.

Defendant did not present any evidence on his own behalf. After deliberating for fifty-five minutes, the jury found defendant guilty of robbery with a dangerous weapon and of first-degree murder on the theory of felony murder. The court imposed a life sentence on the basis of the first-degree murder conviction and

arrested judgment on defendant's robbery with a dangerous weapon conviction.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendant.

[1]   Defendant first argues that the trial court erred in denying defendant's motion to dismiss the charge of first-degree murder based on the felony murder theory because the evidence was insufficient to convince a rational trier of fact of defendant's guilt beyond a reasonable doubt. According to defendant, the evidence that he perpetrated the felony murder against the victim in the instant case was speculative at best.

Defendant offers several arguments in support of his position. First, the State's evidence failed to establish the time of the victim's death with any accuracy. This inability was of critical importance because of the inconsistent evidence pertaining to when defendant was at Atkinson Mill on 19 July, if he was there at all. Second, no eyewitnesses to the murder existed, and no specific motive linked solely to defendant was presented by the State. It was common knowledge that the victim carried a large sum of money on his person. Further, many people spoke threateningly of the ease with which the victim could be robbed. Third, no weapon linked defendant to the crime. The State offered a rock as the murder weapon, despite a weak foundation supporting it. The pathologist could only say that the rock, which was in no way linked to defendant, "could be consistent with causing [the victim's] head injuries." The lack of any link between defendant and the rock, combined with the absence of any proof that it was the instrument of death, is fatal to the State's case. Finally, defendant belittles the State's testimony to the effect that a moped strikingly similar to that owned by defendant was seen at Atkinson Mill on the day of the murder. Even if true, the testimony at best placed defendant in the vicinity where the victim's body was found. Further, the State's evidence also placed a man, not explicitly identified as defendant, with a moped near Atkinson Mill on the day of the murder.

Defendant also argues that the evidence was insufficient to show that defendant robbed the victim. The State's case rested on the mere fact that defendant possessed money in the weeks subsequent to the murder and that defendant knew that the victim carried large amounts of money. Defendant's expenditure of money

for dinner and the trailer rental were made possible by defendant's legitimate employment and his involvement in the drug trade. Further, defendant's purported willingness to buy Michelle Hiatt a car and house in exchange for reconciling with defendant was based on suspect testimony, and such extravagance was patently incredible. No evidence showed that the victim had nearly that amount of money in his wallet. As to defendant's awareness of the fact that the victim customarily kept large amounts of cash on his person, defendant reiterates that other persons were aware of this fact as well.

Defendant argues that, taken altogether, the evidence supported a compelling inference that someone other than defendant perpetrated the killing or, at least, robbed the victim. By way of support for his position, defendant notes that the trial court, before denying the motion to dismiss, acknowledged that "this is a close case." In sum, defendant argues, the evidence here, taken in a light most favorable to the State, was "sufficient only to raise a suspicion or conjecture as to whether the offense charged was committed" by defendant. *State v. Evans*, 279 N.C. 447, 453, 183 S.E.2d 540, 544 (1971). Therefore, defendant argues that the State failed to present the "substantial evidence" required to avoid dismissal. *Id.*

The State contends that substantial evidence was presented tending to show that defendant killed the victim while perpetrating a felony in the instant case. As a threshold matter, defendant had a strong motive to rob the victim because he wanted to use the money to facilitate a reconciliation with his girlfriend and daughter. Michelle Hiatt's mother testified that she had told defendant that one reason his relationship with her daughter would not work was because they had no home of their own. Not coincidentally, the State argues, one of the first things defendant did after the robbery-murder was rent a mobile home. In addition, numerous witnesses testified that defendant on various occasions stated how easy it would be to hit the victim on the head and rob him. The State also labels as spurious defendant's argument that the large amount of cash defendant possessed in the wake of the murder was derived from drug deals and legitimate employment. The testimony regarding drug-related money was provided by the defendant's brother, Danny Benson, and was uncorroborated and likely self-serving and exculpatory in design. No substantive evidence suggests that defendant was involved in the drug trade, and he

certainly did not lead the life-style of a drug dealer. Also, the $160.00 defendant earned as a farm laborer does not account for his extravagance in the wake of the murder. Finally, there was substantial evidence placing defendant at Atkinson Mill around the time of the murder. In sum, the State argues that the evidence, when considered as a whole, was sufficient to support defendant's first-degree murder conviction based on a theory of felony murder.

The law attending our review of denials of motions to dismiss in criminal trials is well settled. In *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980), we stated the law as follows:

> Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.

> If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.

*Id.* at 98, 261 S.E.2d at 117 (citations omitted). In conducting our analysis, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *State v. Small*, 328 N.C. 175, 180, 400 S.E.2d 413, 417 (1991). Finally, "contradictions and discrepancies do not warrant dismissal of the case—they are for the jury to resolve." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

We agree with the State that there exists substantial evidence that defendant killed the victim while engaged in a robbery of the victim. The evidence of defendant's presence at the murder scene around the time of the victim's death, while not unequivocal, is strong. There also exists strong evidence that defendant had a motive for committing the robbery-murder of the victim; he had a great desire to reconcile with his girlfriend and child and felt that obtaining a large amount of cash in a quick fashion was the only means to that end. Defendant was aware that the victim carried a large amount of money on his person and that because of the victim's advanced age, it would be easy to forcibly obtain the money. Indeed, defendant himself had often spoken of the ease with which the crime could be accomplished, stating that the victim

STATE v. BENSON

[331 N.C. 537 (1992)]

could easily be hit on the head and have his money taken—the very modus operandi employed in the victim's actual murder. In sum, viewed in the light most favorable to the State, there exists substantial evidence to support defendant's first-degree murder conviction under the felony murder theory. *See* N.C.G.S. § 14-17 (Supp. 1991).

[2]  In his remaining assignment of error, defendant argues that the trial court committed reversible error in admitting into evidence corroborative testimony provided by a witness for the State when the testimony included critical facts not previously testified to by the principal witnesses. The first basis for defendant's assignment of error involves testimony provided by Kenneth Eatmon, an investigator with the Johnston County Sheriff's Department, who testified to statements made to him by Randy Bryan, who shared a jail cell with defendant prior to trial. On direct examination by the State, Bryan testified as follows:

> Q. And did you have occasion to discuss with [defendant] the reasons that he was being held in Johnston County Jail?
>
> A. Yes.
>
> Q. What did you and he talk about?
>
> A. Just told me what he was charged with and I didn't know any other people he was talking about and—just talking. He told me what he was charged with and what kind of evidence they had.
>
> Q. And what did he tell you? What did he tell you?
>
> A. He told me that the guy had got hit with a rock and they had found some blood, but it didn't match, and they didn't have any evidence. They had to let him go because they didn't have any evidence.
>
> Q. Now, did you ever hear [defendant] make any statement about any dreams that he was having?
>
> A. Yes.
>
> Q. What did [defendant] tell you?
>
> A. He said he had some nightmares when he first went there, but, I guess, when he was taken in jail. And they had some doctors that are there, somewhere, to be evaluated.

Q. All right. When he said he was having nightmares, did he tell you what the nature of the nightmares were about [sic]?

A. About the guy in the river. I don't know who he was talking—. Also, it was the one—.

Q. What did he tell you about the nightmares?

A. That he saw the guy in the river floating and—

Q. Did he tell you how long he had had those nightmares? When?

A. He said for a few days after he first got there. The first week or something; I don't know. I'm not sure exactly.

Q. Now, did he also talk to you about anything else?

A. Well, he told about the rock that they had found, and he named the guy, I didn't know any of them. I'm not from this area. He told me they found a pair of jeans with some blood; it matched animal blood where they had been hunting. He was talking about some of the evidence they had and things like that, or what he thought they had.

Shortly after Bryan's testimony, the State called Eatmon to the witness stand. Eatmon testified on direct examination as follows:

Q. And did Randy Thomas Bryan give you a statement at that time?

A. Yes, he did.

MR. HALE [counsel for the State]: Your Honor, for the purpose of corroborating the witness, I would now offer the statement.

THE COURT: Is there any objection by the defendant?

MR. MORGAN [defense counsel]: Yes, Your Honor, there is.

THE COURT: All right. Ladies and gentlemen of the jury, the statement—the testimony of this witness is offered for the purpose of corroborating the witness, Randy Bryan, if you find that it, in fact, does corroborate the witness, Randy Bryan, and for no other purpose.

All right, sir.

MR. HOLLAND [defense counsel]: We further object to it being repetitious.

STATE v. BENSON

[331 N.C. 537 (1992)]

THE COURT: Well, overruled.

Q. With the Court's permission, would you please, Lieutenant Eatmon, relate to the jury what Randy Thomas Bryan told you on April 18, 1990?

A. Statement goes as this: Randy states he's in the same cell block where [defendant] is; that [defendant] has been talking about the murder he is charged with saying they don't have enough evidence to hold him. [Defendant] talked about a pair of jeans with a small amount of blood on them that could not be identified. [Defendant] also talked about a rock that was found with some blood on it, but they couldn't identify it either. [Defendant] told Randy that when he was first arrested he, [defendant], had nightmares when he was first in about seeing the old man floating in the water, but hasn't had any nightmares since then, so he, [defendant], must not have a conscience.

[Defendant] further told Randy that the law had tried to pressure him into confessing, but he wasn't going to confess to anything because they, the law, didn't have any evidence.

Q. That's the statement in substance that Mr. Bryan gave you on April 18, 1990?

A. That's correct.

Defendant argues that the admission of Eatmon's testimony, ostensibly for corroborative purposes, was erroneous; Bryan made no reference during his trial testimony either to the fact that defendant lacked a conscience or to the fact that defendant would not confess because the State lacked sufficient evidence. Defendant argues that the error and attendant prejudice stemming from the admission of the testimony were borne out by the court's statement to counsel, made out of the presence of the jury, which was as follows:

[THE COURT:] . . . It's now 4:55. The Court being in session, I admonish the attorneys for the State not to mention in jury argument or any other — or any stage of the proceedings in the presence of the jury, Detective Eatmon's statement that the witness Bryan told the witness Eatmon that the defendant . . . told [Bryan], quote, that he must not have a conscience, end quote. Quote, I won't confess because they don't have enough evidence to hold me, end quote.

The Court finds that this testimony by the—by the witness Eatmon purportedly to corroborate the witness Bryan is not corroborative and that the prejudicial effect of this statement which could lead to the conclusion that the defendant, in some way, confessed to the murder when the witness Bryan made no indication of that fact, would outweigh the probative value of such testimony.

According to defendant, because this error was prejudicial, he is entitled to a new trial.

The State first contends that defendant's assignment of error is not reviewable by this Court by reason of the fact that defendant waived any potential assignment of error because it was not properly preserved. The defendant lodged only a general objection to Eatmon's challenged statement and later lodged another objection alleging that the testimony was repetitious, the latter objection being irrelevant to this assignment of error. Thus, argues the State, waiver occurred. N.C.G.S. § 8C-1, Rule 103(a)(1) (1988); N.C. R. App. P. 10(b).

Further, the State urges that portions of Bryan's statement such as the reference to defendant's dreams about seeing an old man floating in the water are clearly competent to support Bryan's in-court testimony. Therefore, it was incumbent upon defendant to lodge specific objections to the other parts of Bryan's statement that he now contends are incompetent, that is, that defendant must not have a conscience and that he would not confess because the State lacked sufficient evidence.

> In a noncapital case, where portions of a statement corroborate and other portions are incompetent because they do not corroborate, the defendant must specifically object to the incompetent portions.

*State v. Harrison,* 328 N.C. 678, 682, 403 S.E.2d 301, 304 (1991).

Furthermore, the State contends that Eatmon's testimony referring to defendant's lack of conscience and refusal to confess due to insufficient evidence implicating him in the crime was substantially similar to Bryan's in-court testimony and was therefore properly admitted. *State v. Rogers,* 299 N.C. 597, 264 S.E.2d 89 (1980).

Further, the State argues, even if error, the admission of the testimony was harmless. Given the strong circumstantial evidence

against defendant, the State argues, there is no reasonable possibility that, absent the alleged error, the jury would have reached a different result. N.C.G.S. § 15A-1443(a) (1988); *State v. Martin*, 322 N.C. 229, 367 S.E.2d 618 (1988).

Finally, the State contends that the error here, if any, was cured when the trial court, subsequent to defense counsel's cross-examination of Eatmon, specifically instructed the jury as follows:

> THE COURT: Ladies and gentlemen of the jury, I have previously instructed you as to corroborative testimony. That you are to consider the statement given the officer in so much as it tends to corroborate the testimony that you heard from the witness stand from the witness. Anything that this witness might have testified to that was not testified to by the prior witness, Randy Bryan, you are not to consider.

As a threshold matter, we disagree with the State that defendant waived this assignment of error because he failed to specify the nature of his objection. The patent nature of the basis of defendant's objection is borne out by the fact that the trial court responded to the objection in terms of the very basis sought by defendant: that the testimony about to be provided by Eatmon was not corroborative of Bryan's testimony. Therefore, we conclude that defendant successfully preserved this assignment of error for appellate review. *See* N.C.G.S. § 8C-1, Rule 103(a)(1) ("No particular form is required in order to preserve the right to assert the alleged error upon appeal if the motion or objection clearly presented the alleged error to the trial court . . . ."); N.C. R. App. P. 10(b).

However, we agree with the State that, because defendant, in this noncapital trial, made only a broadside objection to the allegedly incompetent corroborative testimony, this assignment of error is waived. *Harrison*, 328 N.C. at 682, 403 S.E.2d at 304. Assuming, *arguendo*, that defendant properly preserved this assignment, we conclude that the error here, if any, was cured by the trial court's instruction in the wake of Eatmon's testimony. *State v. Batts*, 303 N.C. 155, 160, 277 S.E.2d 385, 388-89 (1981); *see also Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985) ("The Court presumes that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."). Moreover, given the substantial evidence against defendant, there is no reasonable possibility that, absent the alleged

error, the jury would have reached a different result. N.C.G.S.
§ 15A-1443(a); *State v. Martin*, 322 N.C. 229, 367 S.E.2d 618 (1988).

**[3]** Defendant also objects to another portion of Eatmon's testimony,
this time pertaining to a statement provided to Eatmon by Elton
Mitchell. Mitchell testified as follows:

Q. All right. Did you see the defendant . . . on that occasion?

A. Yes.

Q. And under what circumstances did you see [defendant]?

A. My brother, he was on the inside and he just walked up
to the car and started talking.

Q. Who walked up to the car and started talking?

A. [Defendant].

Q. What did he say to you?

A. His words was, let's go knock Chunk in the head and—

Q. Did you know who he was referring to?

A. Yes.

Q. Who?

A. Mr. Chunk Horne.

Q. What did you think about when you heard him make that
statement to you?

A. He kind of laughed and I didn't pay it a bit of mind and
never thought nothing else of it.

During the State's direct examination of Eatmon, the following
exchange occurred:

MR. O'HALE: For the purposes of corroboration, Your
Honor, we offer this testimony on February the 7, 1990.

Q. Detective Eatmon, would you please relate to the Court
and jury the statement given to you by Elton Howard Mitchell?

MR. HOLLAND: Objection.

THE COURT: The evidence now being offered by the State
is for the purpose of corroboration. If you, the jury, find that

the testimony of this witness does, in fact, corroborate the witness Parrish (sic) who previously testified.

All right. Overruled, go ahead.

Q. Okay. What did Elton Mitchell tell you on February 7, 1990?

A. Elton stated that he knew Mr. Joe, Chunk, Horne. That he also knew [defendant]. Further stated that sometime three to four weeks prior to Mr. Horne being killed, that he, Mitchell, was at the store in Moore School Crossroads and [defendant] was there and they were talking. [Defendant] saw Chunk Horne and stated to Elton Mitchell, there's Chunk Horne, let's go knock him in the head and take his money. Elton stated nothing else was said and [defendant] had not told him anything else since Mr. Horne was killed.

Defendant argues that the trial court committed prejudicial error when it admitted the Eatmon testimony over defense objection. In particular, defendant argues that Eatmon provided a more detailed, divergent account of the incident Mitchell testified to, specifically expanding on the timing and tenor of Mitchell's statement. In support of his position, defendant cites a number of cases where we have ordered new trials because statements admitted by the trial court were not corroborative. *See State v. Moore*, 300 N.C. 694, 268 S.E.2d 196 (1980); *State v. Warren*, 289 N.C. 551, 223 S.E.2d 317 (1976).

The State argues, once again, that defendant waived any objection in this regard because he lodged only a general objection, and hence the matter is not properly preserved for appellate review. Also, because defendant did not specifically object to the allegedly incompetent portions of Eatmon's testimony, he has waived appellate review. Additionally, the Eatmon testimony regarding the Mitchell statement was not so different as to warrant a new trial. Finally, even if erroneously admitted, the testimony was harmless.

Once again, we disagree with the State's assertion that defendant waived his right to appeal this issue because he did not specify the nature of his objection. However, once again, we conclude that waiver did occur by virtue of defendant's failure to lodge objections to the allegedly incompetent portions of the Eatmon testimony. *Harrison*, 328 N.C. at 682, 403 S.E.2d at 304. Assuming, *arguendo*, that the assignment of error was preserved, we conclude that the

testimony was properly admitted. "Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness." *State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980). Prior consistent statements are admissible even though they contain new or additional information so long as the narration of events is *substantially similar* to the principal witness' in-court testimony. *Harrison*, 328 N.C. at 682, 403 S.E.2d at 304. "When the statements are generally consistent with the witness' testimony, slight variations will not render them inadmissible. Such variations affect only the weight of the evidence which is for the jury to determine." *State v. Moore*, 300 N.C. 694, 697, 268 S.E.2d 196, 199 (1980) (citation omitted).

Here, the variation between Mitchell's testimony and Eatmon's recapitulation of Mitchell's prior statement is modest. Mitchell testified that he heard defendant say something to the effect of "let's go knock [Mr. Horne] in the head and —." Eatmon's depiction of the Mitchell statement was as follows: "let's go knock [Mr. Horne] in the head and take his money." Also, Eatmon stated that the pertinent conversation between Mitchell and defendant took place some three to four weeks prior to the murder, a fact not stated by Mitchell during his testimony. We conclude that the testimonies provided by Mitchell and Eatmon were substantially similar; Eatmon's reference to the timing of the conversation is properly considered a "slight variation[ ]" and therefore went only to the weight of the testimony. Mitchell's prior statement to Eatmon, "although including additional facts not referred to in his testimony, tended to strengthen and add credibility to his trial testimony. [It was], therefore, admissible as corroborative evidence." *State v. Ramey*, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986).

For the foregoing reasons, we conclude that defendant received a fair trial, free of prejudicial error.

No error.