IN THE SUPREME COURT OF NORTH CAROLINA

No. 155PA22

Filed 23 August 2024

STATE OF NORTH CAROLINA

v.

TRAVIS LAMONT DAVENPORT

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA20-628 (N.C. Ct. App. May 3, 2022), reversing an order entered on 3 May 2019 by Judge Cy A. Grant in Superior Court, Martin County, denying defendant's motion to dismiss the charge of robbery with a dangerous weapon, and concluding that defendant is entitled to a new trial for first-degree murder. Heard in the Supreme Court on 17 April 2024.

*Joshua H. Stein, Attorney General, by Teresa M. Postell, Special Deputy Attorney General, for the State-appellant.*

*Kellie Mannette for defendant-appellee.*

EARLS, Justice.

This case presents three issues arising from the trial of Travis Davenport for the robbery and murder of Mike Griffin. The first issue is whether the State presented substantial evidence of each essential element of robbery with a dangerous weapon and of Davenport's identity as the perpetrator of that crime. The next issue is whether the admission of evidence related to Davenport's prior incarceration, gang affiliation,

and tattoos rises to the level of plain error. The final issue is whether the statement "Dianne to the house" is admissible under the excited utterance exception to the hearsay rule. We reverse the decision of the Court of Appeals on all three issues and hold that: (1) the State presented substantial evidence of each essential element of robbery with a dangerous weapon and of Davenport's identity as the perpetrator of that crime; (2) the trial court's admission of evidence related to Davenport's prior incarceration, his gang affiliation, and his tattoos was not plain error; and (3) the statement "Dianne to the house" is admissible pursuant to the excited utterance exception to the hearsay rule.

## I. Procedural History

On 3 May 2019, Travis Davenport was convicted of robbery with a dangerous weapon and first-degree murder under theories of premeditation and deliberation and felony murder. Davenport also stipulated to being a level IV felony offender with eleven prior record points. The trial court sentenced Davenport to life in prison for the first-degree murder conviction and 97 to 129 months for the robbery with a dangerous weapon conviction.

On appeal, Davenport argued that the trial court erred in denying his motion to dismiss the charge of robbery with a dangerous weapon. *State v. Davenport*, No. COA20-628, slip op. at 8 (N.C. Ct. App. May 3, 2022) (unpublished). Davenport also claimed he was entitled to a new trial on the charge of first-degree murder because the trial court erred in allowing inadmissible character evidence of Davenport's prior

incarceration, gang affiliation, and tattoos under Rule 404(b) of the North Carolina Rules of Evidence. *Id*. at 13.

The Court of Appeals held that Davenport's motion to dismiss the robbery charge should have been granted because the State had not presented substantial evidence of each essential element of the crime. *Id*. at 10–11. On the admissibility of Rule 404(b) evidence pertaining to Davenport's prior incarceration, gang involvement, and tattoos, the court determined that admission of that evidence amounted to plain error. *Id*. at 22. Based on this, the court awarded Davenport a new trial for the first-degree murder charge. *Id*. Lastly, the court held that the hearsay statement "Dianne to the house" was inadmissible hearsay. *Id*. at 25. However, because it had already awarded Davenport a new trial pursuant to improperly admitted 404(b) evidence, the court declined to reach the question of whether admission of the hearsay statement was prejudicial. *Id*. The State petitioned for discretionary review, which this Court allowed on 1 March 2023.

## II.    Background

After being released from prison in 2015, Travis Davenport moved to Rocky Mount, North Carolina, to live with his brother, Timothy, and his sister-in-law, Sylvia. Davenport's mother lived in Williamston, North Carolina, and Davenport often visited her there. The victim, Mike Griffin, also lived in Williamston. Griffin sold cocaine and had previously been in prison. Davenport and Griffin dated in the 1990s, and they rekindled their relationship in November 2015.

Griffin had diabetes and received dialysis treatments several days a week. These treatments were always early in the morning. On treatment days, Griffin would wake up and shower between 4:30 a.m. and 4:45 a.m., check his blood sugar and eat breakfast around 5:00 a.m., and leave around 5:30 a.m. Craig Daniels, a local magistrate, routinely provided Griffin with transportation to his dialysis appointments around 5:30 a.m.

Griffin had a close relationship with both of his nieces. His niece, Marion Griffin Knight, sometimes drove him to medical appointments, and his other niece, Somers Griffin, lived two blocks away from Griffin and spoke to him daily. Griffin introduced Davenport to his two nieces in November and December of 2015. At that time, Somers believed that Griffin and Davenport had a "good relationship."

That relationship changed later in December 2015 when Griffin and Davenport got into an argument, which led to a physical altercation. According to Somers, Davenport "put[ ] hands on" Griffin, and Griffin responded by "pull[ing] out a blade." Somers later called Davenport to discuss the incident. During that call, Davenport called Griffin a "mother fucker." Referring to himself, Davenport stated that he was not "the same Travis he used to be," identified himself as "Blood," and stated it was "against his gang religion" for someone to pull a weapon on him. In addition, Davenport stated, "If I had my banger I would've did that mother fucker dirty" and stated, "If that mother fucker pull out a blade on me again I will do that mother fucker dirty." At trial, Somers explained that she understood "banger" to mean "gun" and

the term "do him dirty" to mean "kill him."

## A. The Day Before Griffin's Murder

On 18 January 2016, Davenport had a disagreement with his brother, and he was asked to leave his brother's home. Davenport left and went to his mother's home in Williamston. That same day, Griffin went to Somers's home to give her ten dollars to play the lottery. During that visit, Somers noticed Griffin's wallet was so full of money that the "wallet couldn't fold" closed. When Somers asked Griffin why he had so much cash, he said he was going to load it on his card the next day.

That same evening, after 9:00 p.m., Griffin called Somers hurriedly stating, "Dianne to the house" after which they simply hung up. At trial, Somers testified that "Dianne" was a code name for Davenport. At 10:06 p.m., Griffin called William Edwards, a cab driver, to give his "friend" a ride home. Griffin often relied on Edwards to take him to medical appointments and the grocery store. At trial, Edwards testified that he did not recognize Griffin's friend but described him as a Black man with facial tattoos who was wearing a "nice jogging suit, white, trimmed in red, with a hood." Edwards dropped Griffin's friend off near Davenport's mother's home. Witness testimony later established that Griffin had given a white track suit to Davenport as a gift.

## B. The Day of Griffin's Murder

At 12:09 a.m. on 19 January 2016, Davenport called Griffin. The two subsequently exchanged at least eight phone calls, with the last call between them

occurring at 12:39 a.m. Despite phone records showing these calls occurred, Davenport told police he had no contact with Griffin for "about a month" prior to Griffin's death.

Edwards received calls from an unknown number at 12:43 a.m. and at 12:50 a.m. At 1:03 a.m., Edwards returned these calls to what was later identified as Davenport's phone number, and a man answered asking to be driven back to Griffin's home. At pick up, Edwards saw Griffin's friend in the "white jogging suit with red trimming." In the car, the friend told Edwards that "he had just got out of prison" after serving "like thirteen years." Edwards dropped the man off at Griffin's home, and Griffin let the man in. Before departing, Edwards saw Griffin gesturing with his hands through the glass door and presumed Griffin and his friend were arguing.[1]

At 5:08 a.m., Griffin's glucometer was used. But at 5:20 a.m., when Magistrate Daniels arrived to drive Griffin to his dialysis appointment, a Black man, unfamiliar to Magistrate Daniels, waved him away and stated that he "didn't need a ride." Because it was unusual for Griffin to miss a dialysis appointment, a concerned employee from the dialysis center asked the police to conduct a wellbeing check. During this check, officers knocked on Griffin's doors and windows. After receiving no response, officers talked to Griffin's neighbors and called the fire department to

---

[1] Edwards originally told police officers that Griffin and the man in the white track suit appeared to be arguing when he first picked the man up from Griffin's home at around 10:00 p.m., but Edwards later testified that the two appeared to be arguing when he later dropped the man in the white track suit off at Griffin's house. This inconsistency in Edwards's testimony is for the jury to consider. *See State v. Benson*, 331 N.C. 537, 544 (1992).

determine if EMS had picked anyone up from Griffin's home. At approximately 9:30 a.m., the police kicked in Griffin's front door and found Griffin dead in his living room. The medical examiner estimated that Griffin had been dead for two to three hours before the police found him.

Upon entering the home, police found Griffin's love seat pushed up against the front wall of the house with a "reddish staining." There was also a reddish stain under the love seat, on the wall above the love seat, and near the top corner of the front door. Reddish stains were also found in the kitchen, specifically on the kitchen faucet and countertop. The stain on the faucet contained "some type of print in the reddish material." The bag Griffin took to his dialysis appointments was found packed and on the kitchen table. Bags containing a white powdery substance were also found throughout the home. However, Griffin's phone and wallet were not found.

Griffin's body had approximately eight stab wounds to his face and neck and other superficial incised wounds, including defensive wounds, on his face, hands, chest, and abdomen. Griffin ultimately died from a stab wound that cut through his cheek and severed his left common carotid artery. The medical examiner testified that with such a wound, Griffin would have died within "several seconds or minutes." Police found a knife soaking in the kitchen sink, but the medical examiner was unable to determine whether that knife was the murder weapon. However, medical testimony established that the blade used against Griffin was likely two-and-a-quarter to five-and-a-half inches long.

On 25 January 2016, Davenport was arrested. Neither Griffin's cell phone nor his wallet was found on Davenport's person or at Davenport's mother's or brother's home. The white jogging suit was also never recovered. Upon questioning by police, Davenport reported that he was at his mother's home throughout the night of 18 January 2016. His mother and sister confirmed that he was there when they went to bed around midnight and that he was there when they woke up, sometime between 6:45 a.m. and 8:30 a.m.

Following his arrest, Davenport was incarcerated with another inmate, Jeffrey Harrison, who offered to testify as a witness for the State. At trial, Harrison acknowledged that he had a criminal record, had difficulty recalling details, and had initially sought to cooperate with law enforcement in order to be transferred to a prison closer to his family. Harrison testified that Davenport confessed to killing Griffin "to steal . . . $10,000" from him. Harrison also testified that Davenport had caught Griffin cheating on him and that while Davenport "wished he hadn't killed Mike," Davenport was also "glad he did it."

### III. Sufficiency of the Evidence for Davenport's Robbery with a Dangerous Weapon Charge

At trial, Davenport filed a motion to dismiss the charge of robbery with a dangerous weapon, which the trial court denied. The Court of Appeals reversed the trial court's order on this issue. *Davenport*, slip op. at 11. Now, on appeal with this Court, the State argues that the Court of Appeals erred in reaching this conclusion because rather than review evidence favorable to the State "as a whole," *see State v.*

*Thomas*, 296 N.C. 236, 244–45 (1978), the court reviewed the evidence of robbery with a dangerous weapon "in isolation," *see Davenport*, slip op. at 10–11. This was improper under our precedent. *See Thomas*, 296 N.C. at 244–45. Thus, we reverse the decision of the Court of Appeals and hold that the State presented substantial evidence of each essential element of robbery with a dangerous weapon, *see* N.C.G.S. § 14-87(a) (2023), and that Davenport was the perpetrator of that offense. *See State v. Fritsch*, 351 N.C. 373, 378 (2000).

## A. Applicable Law

"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *Id.* (quoting *State v. Barnes*, 334 N.C. 67, 75 (1993)). However, "[i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed." *Id.* (quoting *Barnes*, 334 N.C. at 75). "Whether the State presented substantial evidence of each essential element is a question of law," *State v. Phillips*, 365 N.C. 103, 133–34 (2011), and "[w]e review questions of law de novo," *State v. Khan*, 366 N.C. 448, 453 (2013).

When reviewing sufficiency of the evidence challenges, this Court is required to "view the evidence in the light most favorable to the State [and] give[ ] the State the benefit of all reasonable inferences." *Fritsch*, 351 N.C. at 378–79 (citing *State v.*

*Benson*, 331 N.C. 537, 544 (1992)). Accordingly, "contradictions and discrepancies [in the evidence] do not warrant dismissal of the case"; instead, "they are for the jury to resolve." *Benson*, 331 N.C. at 544 (quoting *State v. Earnhardt*, 307 N.C. 62, 67 (1982)).

The test for sufficiency of the evidence is the same regardless of the type of evidence presented, thus the same test applies "whether the evidence is direct or circumstantial or both." *Fritsch*, 351 N.C. at 379 (quoting *Barnes*, 334 N.C. at 75). In cases involving circumstantial evidence, "the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *Id.* (quoting *Barnes*, 334 N.C. at 75). If this standard is met, "then it is for the jury to decide whether the facts *taken singly or in combination*, satisfy it beyond a reasonable doubt that the defendant is actually guilty." *Id.* (cleaned up).

## B. Robbery with a Dangerous Weapon

Pursuant to N.C.G.S. § 14-87(a), robbery with a dangerous weapon has three elements: "(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened." *State v. Hartman*, 344 N.C. 445, 473 (1996) (quoting *State v. Olson*, 330 N.C. 557, 566 (1992)). Moreover, the commission of a robbery "does not depend upon whether the threat or use of violence precedes or follows the taking of the victims' property." *State v. Barden*, 356 N.C. 316, 352 (2002) (quoting *State v. Green*, 321 N.C. 594, 605 (1988)). And "[w]here there is a continuous transaction, the temporal order of the threat or

use of a dangerous weapon and the takings is immaterial." *Id.* (quoting *Green*, 321 N.C. at 605). Furthermore, if "the theft and the force are aspects of a single transaction, it is immaterial whether the intention to commit the theft was formed before or after force was used upon the victims." *Id.* (quoting *Green*, 321 N.C. at 605).

At the motion to dismiss stage, recovery of the stolen item is not required to support that a taking occurred. *State v. Palmer*, 334 N.C. 104, 112–13 (1993). In *Palmer*, the indictment charged that the defendant took cash and a gun from the deceased victim, but the defendant argued that there was no evidence to support the robbery. *Id.* Regarding the stolen money, this Court found it sufficient that there was evidence supporting that the victim "always had money," that her purse had been emptied, and that no money was found following a search of the apartment. *Id.* This Court also determined that the defendant's extrajudicial confession to a detective, in which he stated that "after he had shot [the victim], he carried the pistol from the apartment," was sufficient to support "the jury's finding that [the defendant] took the pistol during the course of the robbery." *Id.* at 112.

To be sure, there are special rules surrounding extrajudicial confessions. Namely that, "an extrajudicial confession, standing alone, is not sufficient to sustain a conviction of a crime." *State v. Cox*, 367 N.C. 147, 151 (2013) (quoting *State v. Parker*, 315 N.C. 222, 229 (1985)). In cases where the State relies on a defendant's extrajudicial confession, the doctrine of *corpus delicti* applies, and this inquiry must be completed before consideration of whether the State presented enough evidence to

survive a motion to dismiss. *Id.* Under this doctrine, the State must provide "corroborative evidence, independent of the defendant's confession, tending to show that (a) the injury or harm constituting the crime occurred and (b) this injury or harm was done in a criminal manner." *Id.* But this evidence does not need to "tend to show that the defendant was the guilty party." *Id.* at 152 (cleaned up).

The *corpus delicti* doctrine is grounded in three policy justifications aimed at protecting criminal defendants. *Id.* at 151. First, the rule is intended "to protect against those shocking situations" in which a defendant has confessed to murder but the alleged victim later turns up alive after the defendant has already been convicted or worse, executed. *Id.* (cleaned up). Second, the rule ensures that "confessions that are erroneously reported or construed, involuntarily made, mistaken as to law or fact, or falsely volunteered" by a person with a mental impairment or illness "cannot be used to falsely convict a defendant." *Id.* (cleaned up). Lastly, the rule exists to encourage and "promote good law enforcement practices by requiring thorough investigations of alleged crimes to ensure that justice is achieved and the innocent are vindicated." *Id.* (cleaned up). In essence, this rule is concerned with the trustworthiness of the accused's confession. *See Parker*, 315 N.C. at 237–38.

In *Parker*, this Court expanded the type of corroborating evidence sufficient to show that a confession is "trustworth[y]" under the *corpus delicti* doctrine in noncapital cases. *Id.* at 235. In doing so, this Court explained that "if the accused's confession is supported by substantial independent evidence tending to establish its

trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime," "it is no longer necessary that there be independent proof tending to establish the *corpus delicti* of the crime charged." *Id.* at 236. However, in cases where "independent proof of loss or injury is lacking, there must be strong corroboration of essential facts and circumstances embraced in the defendant's confession." *Id.* (emphases omitted). This helps ensure the trustworthiness of a confession and "protect[s] against convictions for crimes that have not in fact occurred." *Id.*

## C. Application to Davenport's Case

### 1. First Element of Robbery with a Dangerous Weapon

Based on *Palmer*, the State argues that in this case, there was substantial evidence to support the robbery charge because there was evidence Griffin's wallet was full of money and neither the money nor Griffin's cell phone were found during the police officers' search of Griffin's home. This case is similar to *Palmer* because while Griffin's wallet and cell phone were never found at the scene of Griffin's murder, the evidence shows that Griffin's wallet contained a large sum of money the day before the murder and that he did not plan to load that money onto his card until the following day. *See Palmer*, 334 N.C. at 112–13. There is also evidence that Griffin had possession of his cell phone until the morning of the robbery and murder. Thus, recovery of Griffin's cell phone, wallet, and the money in that wallet were not required to show the first element of robbery with a dangerous weapon, *see id.*, that an

"unlawful taking or an attempt to take personal property" occurred "from the person or in the presence of another," *Hartman*, 344 N.C. at 473 (quoting *Olson*, 330 N.C. at 566). We hold that the State presented substantial evidence of the first element of robbery with a dangerous weapon and that when this evidence is viewed in the light most favorable to the State and taken "as a whole," *see Thomas*, 296 N.C. at 245, with the evidence discussed below, there is substantial evidence that Davenport was the perpetrator of that offense. *See Fritsch*, 351 N.C. at 378.

### 2. *Second and Third Elements of Robbery with a Dangerous Weapon*

There is also substantial evidence to support elements two and three of the crime of robbery with a dangerous weapon: that there was "use or threatened use of a firearm or other dangerous weapon" and that "the life of a person is endangered or threatened." *See Hartman*, 344 N.C. at 473 (quoting *Olson*, 330 N.C. at 566). This evidence is based on the manner in which Griffin was killed, the fact that a knife was found soaking in the sink, and the fact that there were reddish stains on the kitchen counter and faucet. Moreover, because there is evidence showing that Griffin was killed, this supports that his life was endangered or threatened. *See id*. When this evidence is taken together with Davenport's confession, in the light most favorable to the State, *Fritsch*, 351 N.C. at 378, and "as a whole," *Thomas*, 296 N.C. at 245, there is substantial evidence to support elements two and three of robbery with a dangerous weapon. Accordingly, we hold the State met its burden to present substantial evidence of each element of the charged crime.

Additionally, pursuant to *Parker*, the State contends that Davenport's confession to Harrison is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show Davenport had the opportunity to commit the crime. *See Parker*, 315 N.C. at 236. Indeed, the State emphasizes that even in cases where proof of loss is lacking, if there is a "strong corroboration of essential facts and circumstances" embraced in the defendant's confession, this Court will deem that confession to be trustworthy. *See id.* (emphases omitted).

Here, evidence that Davenport had the opportunity to commit the robbery is supported by witness testimony and the cell phone records of three different people: Griffin, Davenport, and Edwards. In *Cox*, the crime at issue was possession of a firearm by a felon under N.C.G.S. § 14-415.1. 367 N.C. at 150. Applying the standard in *Parker*, this Court reviewed the evidence to determine whether there were facts "link[ing] defendant temporally and spatially to the firearm." *Id.* at 153.

Here, there is testimony from Edwards and Somers which temporally and spatially link Davenport to the crime scene. Specifically, Somers testified that after 9:00 p.m. the night before the robbery and murder, Griffin called her and said, "Dianne to the house." Because Somers also testified that "Dianne" was code for Davenport, this testimony links Davenport to the scene of the robbery and murder, Griffin's home.

Additionally, Edwards testified that he picked up one of Griffin's friends—a

Black man matching Davenport's description with facial tattoos in a white jogging suit with red trim and a hood—from Griffin's home after 10:00 p.m. that same night. This evidence together with the calls Edwards received from Davenport's phone number at 12:43 a.m. and 12:50 a.m., requesting to be taken back to Griffin's home that night, also links Davenport to the scene of the crime. Indeed, perhaps the strongest evidence linking Davenport both spatially and temporally to the crime is Edwards's testimony that the man he picked up and took to Griffin's home sometime after 1:00 a.m. was wearing a "white jogging suit with red trimming" and told Edwards that he had recently been released from prison after serving a thirteen-year sentence. In addition, Edwards testified that after he dropped the man off at Griffin's home, Griffin let the man in. This evidence links Davenport to the robbery and murder and shows that he had the opportunity to commit the charged crime. *See Cox*, 367 N.C. at 153.

Lastly, Davenport's confession to Harrison provided that Davenport was in a sexual relationship with Griffin so that he could steal from him. Specifically, Davenport confessed to Harrison that he stole $10,000 from Griffin. Somers's testimony that on 18 January 2016 Griffin's wallet was so full of money that it would not close, corroborates Davenport's confession to Harrison that he killed Griffin to steal $10,000 from him. Accordingly, Davenport's confession strongly corroborates an essential fact and circumstance of the charged crime. *See Cox*, 367 N.C. at 153; *Parker*, 315 N.C. at 236. Based on this evidence, the State presented substantial

-16-

evidence showing that Davenport was the perpetrator of the crime charged. *See Fritsch*, 351 N.C. at 378.

Under our precedent "evidence favorable to the State [must] be considered as a whole in order to determine its sufficiency." *Thomas*, 296 N.C. at 244–45. "This is especially necessary in a case, such as ours, when the proof offered is circumstantial, for rarely will one bit of such evidence be sufficient, in itself, to point to a defendant's guilt." *Id.* at 245. In applying this analysis, we reverse the Court of Appeals' holding and hold that when the evidence in this case is "considered as a whole," *id.* at 245, and taken "in the light most favorable to the State" a "reasonable inference[ ]" can be drawn that Davenport committed the crime he was charged with, *see Fritsch*, 351 N.C. at 378–79; *see also id.* at 379 (stating that in cases involving circumstantial evidence "the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances" (quoting *Barnes*, 334 N.C. at 75)) Stated another way, the trial court properly denied Davenport's motion to dismiss the charge of robbery with a dangerous weapon because the State provided substantial evidence of all three elements of the crime charged and that Davenport was the perpetrator of such offense. *See id.* at 378.

## IV. Plain Error Review

This Court "has elected to review unpreserved issues for plain error when they involve . . . rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584 (1996). To establish plain error,

a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518 (2012) (cleaned up). Ultimately, the question a reviewing court must answer is whether without the improperly admitted evidence, the jury probably would have reached a different result. *State v. Reber*, No. 138A23, slip op. at 11 (N.C. May 23, 2024).

The issues subject to plain error review in this case relate to the admission of evidence regarding Davenport's prior incarceration, his gang affiliation, and his tattoos. While Davenport filed a motion in limine objecting to the admission of evidence regarding his prior incarceration, he failed to object each time this evidence was offered. Additionally, Davenport did not object when evidence of his gang affiliation and tattoos was presented. Davenport's failure to continuously object to the admission of these three types of evidence means none of these issues were properly preserved for appeal. *See State v. Brown*, 327 N.C. 1, 17 (1990).

We hold that the evidence at issue in this case does not meet the prejudice prong of the plain error standard and decline to reach whether evidence of Davenport's prior incarceration, gang affiliation, or tattoos was improperly admitted pursuant to Rule 404(b). Under the second prong of our plain error standard,

Davenport must show he suffered prejudice. *See Reber*, slip op. at 11. This is done by showing that without the admission of the evidence in question, the jury probably would have reached a different result. *Id*. The properly admitted evidence in this case tended to show that Davenport and Griffin exchanged several calls leading up to Griffin's robbery and murder, and that someone matching Davenport's description was picked up from Griffin's home the night before Griffin's murder and driven back to Griffin's home after 1:00 a.m. the morning of Griffin's murder. Somers also testified that Griffin called her the night before his murder and said, "Dianne to the house." Thus, this evidence placed Davenport at the scene of the crime the night before and the morning of Griffin's murder. In addition, Harrison testified that Davenport confessed to him that he had killed Griffin "to steal . . . $10,000" from him, and that he both "wished he hadn't killed Mike" and was also "glad" that he did. Accordingly, we cannot say that if the evidence of Davenport's prior incarceration, tattoos, and gang affiliation had been excluded the jury probably would have reached a different result. We reverse the Court of Appeals' holding and hold that the evidence of Davenport's prior incarceration, gang affiliation, and tattoos does not rise to the level of plain error because admission of this evidence was not prejudicial.

## V.    Hearsay

At issue is Griffin's statement "Dianne to the house." " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c)

(2023). Under Rule 802, hearsay is not admissible unless an exception applies. N.C.G.S. § 8C-1, Rule 802 (2023). In Davenport's case, Somers testified that Griffin called her on the evening of 18 January 2016, after 9:00 p.m. and said, "Dianne to the house." While Davenport objected to this statement, the trial court overruled that objection. Somers also testified that Dianne was a code name for Davenport.

Because the statement "Dianne to the house" was offered to prove that Davenport went to Griffin's home the night of Griffin's murder, this statement is hearsay. *See* N.C.G.S. § 8C-1, Rule 801. However, the Court of Appeals erred in finding that the statement was not admissible under our hearsay rules. Namely because in this case, the excited utterance exception to the hearsay rule applies.

Under Rule 803, an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C.G.S. § 8C-1, Rule 803(2) (2023). "To qualify as an excited utterance, the statement must relate (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Nicholson*, 355 N.C. 1, 35 (2002) (cleaned up). We have previously held that testimony about a phone conversation that takes place immediately after a startling event is admissible. *State v. Murillo*, 349 N.C. 573, 587 (1998). Here, Somers described the statement as "hurried" and stated that after Griffin said, "Dianne to the house," she said, "Okay. Bye." Based on the brevity of this statement, it is clear that Griffin called Somers with one urgent purpose: to relay an

important piece of information, that Davenport was coming to Griffin's house.

There is evidence that a month before this phone call, Griffin and Davenport experienced conflict in their relationship, which led to a physical altercation involving a knife and subsequent threats by Davenport that if he would have had his gun, he would have killed Griffin at the time of that altercation. The hurried and brief nature of Griffin's phone call to Somers supports that Griffin was startled at learning that Davenport was coming to his home, and this led him to hurriedly call Somers.

Because there is evidence that Griffin and Davenport had experienced some recent conflict in their relationship and the statement Griffin made followed a startling experience and was brief and quick, this statement qualifies as an excited utterance. *See Nicholson*, 355 N.C. at 35. Accordingly, the Court of Appeals erred by concluding "Dianne to the house" was inadmissible hearsay.

## VI.    Conclusion

We reverse the decision of the Court of Appeals on the three issues before us and hold that: (1) the State presented substantial evidence of each essential element of the charged offense, robbery with a dangerous weapon, and of Davenport's identity as the perpetrator of that offense; (2) admission of evidence of Davenport's prior incarceration, his gang affiliation, and his tattoos does not rise to the level of plain error because admission of this evidence did not prejudice Davenport; and (3) the statement "Dianne to the house" is admissible under the excited utterance exception to our hearsay rule.

REVERSED.

Justice DIETZ did not participate in the consideration or decision of this case.